[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. NATURE OF PROCEEDINGS
By petitions dated March 14, 1991, the Commissioner of the Department of Children and Youth Services, hereinafter known as DCYS or as the Petitioner, seeks termination of the CT Page 4919 parental rights of Love M., Mother, and Frank M., Father, in and to Ashley M., born January 22, 1987, and Alysha M., born July 28, 1988. The alleged grounds in both cases, pursuant to Conn. Gen. Stats., 17a-112, are:
1. FAILURE TO REHABILITATE
(Section 17a-112 (b)(2))
2. ACTS OF COMMISSION OR OMISSION
(SECTION 17A-112(B)(3))
The Petitioner further alleges that both claimed grounds have existed for not less than one year.
Both Mother and Father appeared through counsel; trial began on July 19, 1991, and testimony was taken on July 19, 22, August 8, 9, 30, December 13 and December 23, 1991.
II. PROCEEDINGS PRIOR TO FILING OF THESE PETITIONS
On April 27, 1989 the Petitioner filed co-terminous petitions along with a request for an ex parte Order of Temporary Custody, based upon an attached affidavit from Tracy L. Shoemaker, a DCYS social worker, which stated that on April 24, 1989, Ashley had a black eye and other facial bruises, that on April 25, 1989, Mother called Father in the evening and told him that she didn't want the children any longer; that as soon as she finished doing a line of cocaine, she was going to lock the children in a car at a Texaco station on Main Street in Niantic, and leave them there; that Father arrived at the gas station as Mother was leaving; and that the children were locked in the car barefoot, with no extra clothes, or formula for nine-month old Alysha. The affidavit also stated that on April 25, 1989, Father reported that Mother has a severe drug/alcohol problem, that she is a regular user of cocaine and is an intravenous drug user. Father also acknowledged a drug/alcohol problem of his own. The Court found that both children were in immediate physical danger, and on April 27, 1989 awarded temporary custody of both children to the Petitioner. On May 2, 1989, both Respondents agreed to a continuation in effect of the OTC until further order of the Court. Both girls remained in DCYS foster care from April 27, 1989 and were still there on the last day of this trial, December 23, 1991, two years and eight months later.
On June 1, 1989, Mother agreed to cooperate with the recommendations of Dr. Robert Meier, the court-appointed CT Page 4920 psychologist, and entered into a Service Agreement with DCYS. On October 3, 1989, the Court adjudicated the children as neglected and uncared for, and committed them for up to eighteen months. Service Agreements entered into by Mother and Father on October 3, 1989 were entered as Court expectations, and the Court noted that visitation was to be increased as indicated in the service agreements, dependent on substance abuse treatment and verified drug-free status through urinalysis. The Petitioner withdrew the original Termination of Parental Rights Petitions on October 3, 1989.
On May 17, 1991, the Court extended the commitments for up to eighteen months, effective April 3, 1991.
III. WITNESSES AND EXHIBITS
A. Witnesses
The Petitioner presented evidence through the following witnesses: 1) Michael Friedman, Director of New London Counseling Center, who provided family therapy to the Respondents; 2) Dr. Robert Meier, a clinical psychologist and court-appointed expert who evaluated the family on several occasions; 3) Olin Paige, the father's landlord; 4) Officer Joseph Clark of the Groton Town Police Department; 5) Cherry Brennan, a clinical social worker at Family Service Association of New London, who provided therapy for the mother through the Journey Program; 6) Patricia Morrissey, a psycho-therapist at United Community Services who counseled the children; 7) Marilyn Diamondstone, social worker at Lawrence and Memorial Hospital, Partial Hospitalization Program, who offered services to the mother; 8) John Mercier, formerly a DCYS intake worker and presently a social work supervisor; 9) Sandra Gauthier, the children's foster mother 10) Theresa Bohara, the DCYS social worker assigned to this case; and 11) Eileen Borowski, substance abuse counselor at Lawrence and Memorial Hospital during the period relevant to this matter. The Petitioner produced rebuttal evidence through Trooper Todd Lynch, Connecticut State Police.
The Respondent mother introduced evidence through the following witnesses: 1) John Nasen, Mother's landlord and friend; 2) Dawn Vallas, Olin Paige's daughter and a friend of the Respondent; 3) Barbara Pokorny, Nurse at Expanded Health Services; 4) Dr. Ashok Mahesh of W. W. Backus Hospital; and 5) Dr. Christopher Glenney, an orthopedic surgeon.
B. Exhibits CT Page 4921
The Petitioner introduced twenty-seven full exhibits; Mother introduced five full exhibits and Father one full exhibit.
IV. FACTS
Evidence offered at trial, interpreted in light of the prior record in this court concerning these children, of which the Court takes judicial notice, causes the Court to find the following facts.
In May 1987, Lawrence and Memorial Hospital in New London, reported to DCYS that Ashley, who was about four months old, had sustained a bruise on her head as a result of a domestic dispute between her parents. Father said that he and Mother were at a party, she got drunk, threw a bottle in the car and while they were fighting in the house, he accidentally struck the baby. Mother said Father drinks too much and accidentally hit the baby.
(Testimony of John Mercier, DCYS supervisor).
On April 24, 1989, Father's birthday, Ashley helped Mother make a birthday cake and the table was set for a party. Father telephoned, saying he was having a good time at a bar and asked if the kids were in bed yet. A short time later he called from the house of one of his friends. Mother was angry and told him that she was going to leave the kids in her car at a gas station in Niantic for him to take care of. She left them alone in the car, awake, at the gas station; he was there on foot. Mother yelled at him and started home on foot, a distance of about seven miles.
(Testimony of Mother)
According to Father, Mother told him she was doing a line of cocaine and was going to leave the kids in the car at the gas station for him to care for. On the next day, April 25, 1989, Father brought the children to DCYS for a voluntary placement.
On June 1, 1989, Mother made a complaint to the New London Police that after drinking, Father came home in a violent and angry mood, threw things around the apartment and smashed the VCR with a hammer. Father pushed Mother against the wall and she kicked him. This occurred only a few hours before the parties were due in court for plea on the coterminous petitions filed on April 27, 1989. Father testified that he was going to hit the VCR with a hammer, but it fell off the TV set first. He also said he couldn't CT Page 4922 remember if he was drinking.
Mother testified that she made a complaint on July 2, 1989 because Father came to her home in violation of a Restraining Order, and started pushing her around. Father testified that there was a Restraining Order in effect, but he doesn't remember trying to get in.
On October 3, 1989 the Court adjudicated the children as neglected and uncared for, and they were committed to the custody and guardianship of DCYS for a period not to exceed 18 months. At that time, both parents signed Service Agreements for the period 10/3/89 to 1/3/90, requiring them to establish a safe, stable home and to be free of drugs and domestic violence. (Petitioner's Exhibits 14 and 15).
Between the date of commitment, October 3, 1989, and the date of the Petition, March 14, 1991, Mother and Father have repeated their consistent pattern; live together, argue and/or fight with violence, separate, come together, argue, split up, and round and round the familiar circle again.
(Petitioner's Exhibits 1 and 25)
At no time between October 3, 1989 and March 14, 1991 has there been any indication that parents have established a safe and secure home for their children or that they have made even slight progress toward that goal, which they knew, from constant DCYS reminders, was necessary if reunification were to take place.
Throughout the period October 3, 1989 to March 14, 1991 both parents knew from Service Agreements, Court-set expectations, and conversations with DCYS, that they were to be free from substance abuse and domestic violence if they wanted to be reunified with their children.
On August 30, 1990 Mother came home after drinking and an argument ensued, which resulted in Father receiving a fat lip and an arm bruise from being struck by Mother with a brass candlestick; Father was ambivalent about living with Mother but he felt powerless to keep her out. On September 13, 1990, Mother called DCYS to express her serious concerns about Father's heavy drinking and use of marijuana, and wanted him pulled off the road while driving so he could be tested for substance abuse.
(Testimony of John Mercier) CT Page 4923
Relative to the above August 1990 incident, Ms. Bohara of DCYS testified that Mother told her that Father was throwing knives at her. Also in August 1990, when Mother and Father took the children out to dinner with out-of-state relatives, they had such a bad argument that Father walked out of the restaurant.
(Testimony of Sandy Gauthier, Foster Mother)
The parents fought about what they would do with the children on Christmas Day 1990; whether to go to Father's family or to spend the day together with their children alone. Father promised Sandy Gauthier that they wouldn't argue.
(Testimony of Sandy Gauthier)
On Christmas morning 1990, the parents brought the children to Father's apartment to celebrate the holiday. A short time later, Olin Paige, Father's landlord, who lived upstairs, heard shouting and screaming and the sound of things being thrown around. Father was on his way out, Mother was shouting vulgar language at him, and the children were crying. Things were all over the place in the apartment. Mr. Paige asked both parents on several different occasions to move out because of fights and disturbances that got worse. Mr. Paige and his wife were worried about the children. Fights were very frequent and the police were there several times. During arguments, it sounded like a sledge hammer was being used, with glass breaking and things being thrown about. Mr. Paige saw Mother with a black eye twice, and saw Father with cuts from scissors thrown at him by Mother. He was afraid he would see someone dead, and was afraid the children might get caught in the middle. Mr. Paige said he was afraid of their tempers when they get together, and this keeps happening when Mother and Father reunite.
 (Testimony of Olin Paige and Petitioner's Exhibit 1, page 5)
On December 30, 1990 Mother and Father got into an argument while driving their car, which resulted in an accident when Mother grabbed the steering wheel from Father. The argument was about marijuana Mother found in Father's lunchbox; whereupon she threw the marijuana out the car window. Mother testified that Father lied to her about the marijuana; Father testified that someone put the marijuana in his lunch box. CT Page 4924
Mother and Father were not successful in eliminating substance abuse from their lives. Mother admitted in her testimony that she used cocaine in 1989 and early 1990. She tested positive for cocaine twice in November, 1989 and again on January 5, 1990, when she said the test was positive because of medicine she had taken. On March 1, 1990 a Care Clinic worker, where Mother had been going as ordered by the Court for drug evaluation and screening, reported to DCYS that she hadn't been calling in for urine screens as instructed by Care Clinic, and when asked by DCYS about her plans to seek treatment, Mother said she "really hadn't thought about it." On December 17, 1990 Mother was still drinking.
(Petitioner's Exhibit 1, Pages 2 and 3)
Mother admitted in her testimony that she had used cocaine in February 1991, and the date when this happened was confirmed by Marilyn Diamondstone, a therapist of the Partial Hospitalization Program at Lawrence and Memorial Hospital, as February 20, 1991, just three weeks before the termination of Parental Rights Petition was filed. Ms. Diamondstone also testified that Mother was absent from her urine screenings five times in late February and early March, which was the time between her February 20, 1991 cocaine positive screen and the March 14, 1991 filing date of the Petition.
Father's therapist was Eileen Borowski, who holds a Master's Degree in Psychology. She saw him from July 19, 1989 to May 1990 and he did well until February 1990, when he began to change for the worse. He became withdrawn at meetings and started to miss meetings. He expressed more and more frequently his fear of being a single parent. April 1990, not only was his attendance erratic, but he admitted marijuana use, limited drinking, and his urine screen showed in late April the presence of opiates, which he could not account for. Father chose not to attend AA or NA during the time Eileen Borowski was his therapist, although she had recommended in a report dated 12/28/89 that he make more frequent and regular contact with AA or NA.
 (Testimony of Eileen Borowski and Petitioner's Exhibit 1, page 7)
Father was unable to control his anger during a visit to his children in June 1990, at the home of their foster mother, Sandy Gauthier. He became enraged because Mrs. Gauthier took some cookies away from Ashley and Mrs. Gauthier had to ask him to leave. He kicked over a can of nails and "peeled" out of the driveway, upsetting his CT Page 4925 children so they could not sleep that night.
(Testimony of Sandy Gauthier)
On October 1, 1990, Father admitted to Theresa Bohara of DCYS that he was continuing to occasionally drink. A short time before the filing of the Petition for Termination of Parental Rights, it was reported to DCYS by Father's therapist, Laurie Angelos, that he was not emotionally ready to provide for his children and that he has little insight into his addiction.
(Petitioner's Exhibit 1, Pages 10 and 11)
Between October 1989 and March of 1991 Mother and Father's visits to the children have been sporadic, with many missed visits. (Petitioner's Exhibits 9 and 10, and testimony of Sandy Gauthier).
Efforts to have visits away from the home of the foster parents did not work out because the parents cannot stop arguing. Parents have been unwilling or unable to establish, follow through consistently, and succeed in substance abuse programs and individual and family therapy.
In January 1991, two months before the Termination petition was filed, Father was suspended from his job. He testified that he had three beers in four hours, skidded on the ice, and was suspended because he used a truck he wasn't supposed to be using.
In July and August of 1990, Dr. Michael Friedman, Director of New London Counseling Center, provided family therapy to the parents. He testified that he saw them four times from July 26, 1990 to August 16, 1990. Dr. Friedman testified that the areas of concern were temper control and domestic violence. At the fourth and final session on August 16, 1990, both parents were agitated. They were supposed to come in the following week, but didn't show up or return Dr. Friedman's call. On August 16, 1990 Father wanted nothing more to do with the marriage; Mother was confused and emotional and didn't have any set direction.
(Testimony of Dr. Friedman)
V. EXPERT TESTIMONY
Dr. Meier evaluated Mother and Father in May 1989. Presenting issues were family violence, drug-alcohol abuse and child abuse. Mother admitted a great deal of fighting, CT Page 4926 including physical confrontations, and indicated Father's drinking has been quite heavy. She admitted using cocaine once in the past month and said her use of cocaine varies, and she uses it to calm down. Father did not agree with the report that he has a serious alcohol problem, but said both he and Mother were involved in drugs, and separated about a month ago. He said Mother was spending up to $150.00 every two days for cocaine when they were living together. Father blamed Mother for starting the fights, and said she would punch him in the face and he would only hit her arm or leg. Father was moody, often aggressive, seeing the world as a threatening and hostile place. He is still struggling with substance abuse issues, but tends to deny these problems. Dr. Meier felt that until either or both parents show they can engage in the appropriate treatment processes, demonstrate their ability to provide a home for their children, and show they can remain drug free, the children should remain in placement.
(Petitioner's Exhibit 3)
When Dr. Meier evaluated parents again on January 23, 1990, he felt that once Father established a suitable residence, his visits with the children should gradually increase, with a goal of permanent placement of the children with him. Dr. Meier felt that Mother has not demonstrated a commitment to rehabilitating herself, that stressful situations tend to lead to substance abuse, and she should not have major responsibility for care of the children.
(Petitioner's Exhibit 4)
Dr. Meier evaluated Mother and Father three times from May 1989 to May 1991, and his May 1989 evaluation included a history from both that indicated to him that there was a long history of domestic violence. (Petitioner's Exhibit 3, Pages 2, 6 and 7).
Over the entire time period Dr. Meier saw parents from May 1989 to May 1991, plus a lengthy period prior to his first evaluation in May of 1989, there were and continued to be severe problems between Mother and Father, including tremendous distrust of one another about substance abuse and commitment to rehabilitation, physical violence, and the safety of the children at home. There was little change in this over the two-year period from 1989 to 1991, and the pattern and cycle of violence continued, even with counseling and treatment. The parents' problems are due to personality disorders, which are long-term and resistant to short or moderate term therapy, and therefore the prognosis for their CT Page 4927 relationship is poor. The parents both have a need for their relationship when they are apart, but their anger, hostility and distrust toward each other cause violence when the relationship is resumed. Father is tied to the relationship in a way that causes problems; he cannot follow through on his realistic judgments, and Mother doesn't have insight into the reality of the situation.
(Testimony of Dr. Meier)
VI. LAW AND STANDARD OF PROOF
The termination of parental rights involves two phases: adjudication and disposition. Practice Book 1049, 1042, 1044. At first the court determines whether one or more statutory grounds have been proven. See e.g. In Re Juvenile Appeal (84-AB), 192 Conn. 254, 262 (1984); In Re Nicolina T., 9 Conn. App. 598, 602 (1987). A finding that statutory grounds exist must be made by proof of facts existing on the date the petition was filed or amended. In Re Luke G., 40 Conn. Sup. 316, 323 (1985). Without such a finding, no inquiry may be made as to the ultimate best interest of the child. In Re Juvenile Appeal (Docket No. 10718), 188 Conn. 259, 262-63 (1982); Accord. In Re Luke G., supra; In Re Shannon S., 41 Conn. Sup. 145, 146 (1989).
The standard of proof mandated by Conn. Gen. Stats.17a-112 and Practice Book 1049 is "clear and convincing evidence." This constitutionally mandated standard, Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599c (1982), has been observed by our courts. See e.g. In Re Juvenile Appeal (84-3), 1 Conn. App. 463 (1984).
VII. ADJUDICATION (Based on facts as of March 14, 1991)
The petition of March 14, 1991 alleges two grounds for termination, only one of which need be found for the Court to grant the Petition; In Re Nicolina T., 9 Conn. App. 598,602 (1987). Any ground must have existed for at least one year.
A. Failure to Rehabilitate
This ground is defined in Conn. Gen. Stats.
17a-112 (b)(2) as follows:
 "The parents of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding have failed to achieve such CT Page 4928 degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and the needs of the child, they could assume a responsible position in the life of the child."
These children were adjudicated neglected and uncared for on October 3, 1989, at which time both parents signed Service Agreements which the court set as expectations. These contemplated that the parents would establish a safe, stable, drug-free environment that would be free of domestic evidence.
The record in this case, and the facts expressly found earlier in this Memorandum of Decision, constitute clear and convincing evidence and proof that neither Mother nor Father, as of March 14, 1991, had achieved such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the children, either could assume a responsible position in the life of their children. They were no nearer being able to provide a suitable home for the girls than when they had last had custody of them in April, 1989.
The issue here is not whether they love their children, or whether they tried to solve their substance abuse problems, or whether they wanted to provide the children with a safe, stable home, free of domestic evidence; rather, the issue is whether either has achieved a degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the children, they could assume a reasonable position in their life. The record is replete with repeated instances of the parents' inability, despite attempts, to live apart from each other, or to live with one another, without distrust, anger and violence toward one another. They cannot live in a stable, peaceful way, either with or without each other. This they have demonstrated clearly, from April 1989 up to March 14, 1991, the date of the petition, at which time the children were four and two and a half years old. The record also clearly shows that they have failed to bring their substance abuse problems under control. This, combined with their inability to live together or apart, would have a devastating effect on these two pre-school children, if they were to be with either or both parents.
The Court finds that unfortunately, neither Mother nor Father have successfully rehabilitated themselves. They have reached the point where their rights as parents are in collision with the rights of their children. They do not CT Page 4929 "own" their children, nor are the children's rights subordinate to theirs; the children have their own rights, which are independent of and separate from theirs. Public policy and the law require that the rights of children and their parents, and their mutual interest in preserving the family unit, be accommodated and reconciled as long as that preservation attempt does not infringe upon the rights of the children to have their parents rehabilitate themselves to the point where they can occupy a responsible position in their lives. Mother and Father have had sufficient opportunity to do so, but they have not been able to succeed. The possibility that some day they might be rehabilitated, either living apart from each other or together, is not enough. These children, as of March 14, 1991, like all children four and two and a half years old, have a great need for a safe, secure violence-free home. The parents, neither alone or together, could meet these needs.
The Court finds that the Petitioner has clearly and convincingly proved the Failure To Rehabilitate ground, and that it had existed for not less than one year as of March 14, 1991.
B. Acts of Commission or Omission.
This ground is defined in Conn. Gen. Stats.
17a-112 (b)(3) as follows:
 "The child has been denied, by reason of an act of parental commission or omission the care, guidance or control necessary for his physical, educational, moral or emotional well-being."
From the date the Petitioner obtained temporary custody of the girls on April 27, 1989, until March 14, 1991, the date of this Petition, a period of approximately two years, Mother and Father did not have custody of them. All the evidence in the case indicates that during this period both girls have been well-cared for in a foster home. The Petitioner has not proved by clear and convincing evidence, whatever the problems and deficiencies of the parents have been, that the girls have been denied the care, guidance or control necessary for their physical, educational, moral or emotional well-being. This ground is therefore dismissed.
VIII. ADDITIONAL FACTS (As of December 23, 1991, last day of trial) For use in Dispositional Phase only. CT Page 4930
On June 2, 1991, there was an incident of domestic violence at Mother's apartment. When Groton Police Officer Joseph Clark arrived, he saw Father running toward the door from the outside and put both his hands through the glass door. Father said Mother accused him of being a child molester, for having an affair with a thirteen-year old girl, which he denied. Father said Mother hit him with a frying pan. Mother told the police officer that Father came over to her apartment, cracked the door open, forced his way in, pushed her against the wall and threatened to harm her, so she then got the frying pan.
(Testimony of Officer Joseph Clark)
Regarding the June 2, 1991 incident, Mother testified, contrary to Officer Clark's testimony, that she didn't tell him (Officer Clark) that Father threatened her or that she picked up a frying pan.
Mother also testified that on November 15, 1991, a Friday evening, both she and Father went out separately, as they do every Friday evening. She got home at 1:50 a.m. and he at 7:30 a.m. He had been arrested for Driving Under the Influence by the Connecticut State Police in Groton, Connecticut. Two breathalyzer tests were administered; one at 5:13 a.m., which produced a reading of .176, and the second at 5:52 a.m., which produced a reading of .159. (Petitioner's Exhibit 27, front and back). Father had been at the Bank Street Cafe in New London, and was driving with a suspended license, although he denied that his license was under suspension. (Testimony of Todd Lynch, Connecticut State Policeman)
Dr. Meier testified that his May 1991 written recommendation that parents be given not more than six months to demonstrate that they can provide a non-violent environment, would be changed if, on June 2, 1991, a serious violent incident between Mother and Father occurred. He testified that he would then not have recommended the up to six more months period because his opinion would then have been that more violence would occur and therefore permanent placement should be sought.
In May of 1991 these children had been in placement already for more than two years. Ashley was four years old and Alysha almost three. Based on professional psychiatric guidelines, this is over the maximum time for non-permanent placement and any further temporary placement would be harmful. CT Page 4931
(Testimony of Dr. Meier)
Dr. Meier's report of his May 21, 1991 evaluation of Father, states that Father said there is still distrust between Mother and him and that at times the behaviors leading to conflicts return. Father told Dr. Meier he will try to find an apartment and then try again to live with Mother, and if this doesn't work and the pressures become too great, he will "just get out." He also said he is concerned about the times when she "blows up and swears" at him. He questioned that if she cannot control herself now, how will she be able to when the children are with her? Dr. Meier's report also stated that "It is not in the best interest of these children to remain in placement without permanency for a significant time longer.
(Petitioner's Exhibit 5, Pages 5 and 6)
Inasmuch as the Court has found that statutory grounds (Failure to Rehabilitate) exist to terminate the parental rights of Frank M. and Love M., the Court must go on to consider whether it will be in the children's best interest to enter an order of termination based on facts as of December 23, 1991, the last day of trial.
IX. DISPOSITION — On facts as of last trial date, December 23, 1991.
Between the adjudicatory date of March 14, 1991 and the dispositional date of December 23, 1991, a period of more than nine months, Frank M. and Love M. once again displayed the same kind of behavior that existed for years prior to March 14, 1991. In June there was the same scenario, only this time it was only a short time before their Termination of Parental Rights trial was to begin. They were together at Mother's apartment, an argument ensued, escalating into a confrontation on both sides, followed by Father shoving Mother up against the wall, Mother hitting Father with a frying pan and Father breaking down the door. Again, a reentry into the familiar cycle of; we're miserable without each other and we're even worse when we're with each other. What would this do to two young children placed in this maelstrom? They need consistency, stability, an atmosphere free from shattering glass and upraised frying pans, or worse.
Then in November 1991, right in the middle of trial, Father was arrested at 3:30 a.m. for driving under the influence, with two breath test readings that were significantly higher than the legal limit. Again, the same old problem of substance abuse entered the picture. CT Page 4932
The problems that have plagued Frank M. and Love M. for years are still a part of their lives, and therefore would be present in the lives of their little girls if reunification were to occur, whether the parents were living together or apart. The lives of these children would be in constant turmoil; they would be in the middle of a chronic tug of war and their physical safety and emotional and psychological well-being would be in jeopardy.
Before the Court considers whether termination of parental rights is in the best interests of the children, it must consider the six factors set forth in Conn. Gen. Stats. Sections 17a-112 (d) and 45a-717 (h).
 "The timeliness, nature and extent of services offered or provided to the parent and the child to facilitate the reunion of the child with the parent."
DCYS prepared thorough and comprehensive Service Agreements that clearly spelled out for both parents what the goals were, and exactly what had to be done to achieve those goals. The Department paid for Drug Evaluation and Parenting class. Terry Bohara, DCYS social worker, spoke to clinicians and monitored treatment. The Department talked to Father about the possibility of his becoming the children's caretaker, and met with the parents to discuss reunification. The Department also arranged for visitation and offered to pay for transportation to and from visitation; however, the parents never accepted this offer.
 2. "The terms of any applicable Court Order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order."
The orders for psychological evaluations were complied with. The parents did not comply with all of the terms of the Service Agreements (Petitioner's Exhibits 14 and 15) which were ordered by the Court on October 3, 1989.
 3. "The feelings and emotional ties of the child with respect to his parent, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties." CT Page 4933
There are some positive feelings and emotional ties between parents and children (Petitioner's Exhibit 5). Children get along well with foster mother and father and are both very affectionate in the family. The children go to foster mother readily for affection and are bonded to her.
(Testimony of Sandy Gauthier, Patricia Morrissey and T. Bohara).
 4. "The age of the child." Ashley was born on January 22, 1987 and Alysha on July 28, 1988, so on the last day of trial, Ashley was almost five years old and Alysha almost three and a half.
 5. "The efforts the parent has made to adjust his circumstances, conduct or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to: A. The extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided that the Court may give weight to incidental visitations, communications or contributions and B. The maintenance of regular contact or communication with the guardian or other custodian of the child."
The parents have made spotty and largely unsuccessful efforts to rehabilitate themselves. Their contact with their children and foster family has been sporadic, with many missed visits. Visitations outside the home were disastrous.
 6. "The extent to which a parent has been prevented from maintaining a meaningful relationship by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."
The Court finds that any deficiencies in either parent's relationship with their children are attributable to their own action or inaction and cannot be blamed on anyone else.
The Court finds that these children are normal and healthy and appear to be adoptable. On the last day of CT Page 4934 trial, December 23, 1991, Ashley had been in foster care for about half her life and Alysha about three quarters of her life. The girls have been waiting patiently, and in vain, for a very long time for their parents to prove by their actions that they are ready to provide them with what every child should have, a home that is physically and emotionally safe and secure. These children are entitled to the permanency necessary for their normal development, a permanency that their parents are not able to give them.
Having considered all the testimony and exhibits in this case, as well as evaluating the credibility of each witness, the Court finds by clear and convincing evidence that it is in the best interest of Ashley M. and Alysha M. for the parental rights of both their Mother and Father to be terminated.
X. JUDGMENT
It is therefore ORDERED that the parental rights of Love M. and Frank M. in and to their daughters, Ashley M. and Alysha M. be, and hereby are, terminated. It is further ORDERED that the Commissioner of DCYS is appointed statutory parent for the purpose of placing these children in adoption. Toward this end, the said Commissioner is further ORDERED to submit to this Court, in writing, ninety days from the date of this judgment, a written report of the progress toward such adoption, and thereafter as required by the Court.
XI. APPEAL
The parents have 20 days from the date of this judgment in which to take an appeal. If either requests to take an appeal and if trial counsel is willing to represent that party, this court will appoint that attorney to act as appellate counsel at public expense until all appellate process if completed. Practice Book 4017. If, however, in the exercise of professional judgment as an officer of the Superior Court, such attorney declines to perfect such appeal because, in his or her opinion, it lacks merit, that attorney is not required to do so but may instead simultaneously file a timely motion to withdraw and another motion to extend the appellate period to the full maximum of 40 days as permitted by law. Practice Book 4040. Such motions, if unopposed, will be granted ex parte and a new attorney appointed to review this record and make an independent determination of the merits of such appeal. If the second attorney determines it lacks merit, the reason for this opinion shall be promptly submitted to the court in writing. The party will then be informed by the court clerk as to the balance of the 40 days CT Page 4935 remaining in which to secure counsel for the purpose of taking such appeal, who may, if qualified, be appointed by the court to be compensated by the state. Douglas v. California, 372 U.S. 353 (1963); Fredericks v. Reincke,152 Conn. 501 (1965).
If such procedure satisfies the sixth amendment right to counsel in a criminal proceeding, it is a fortiori appropriate where there are interests of a third party involved: those of the child whose interest in achieving a permanent home is entitled to at least as great a degree of consideration as those of the parent whose right to raise the child is at issue. Even an unsuccessful appeal could further delay permanent planning for years since no child may be adopted until the appellate process is exhausted.
Entered at Montville, this 22nd day of May, 1992.
RICHARD A. WALSH, J.