## IN RE JUVENILE APPEAL (84–3)*
### (2321)

TESTO, HULL and BORDEN, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 2026, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued November 2, 1983—decision released March 27, 1984

*John C. Wirzbicki,* for the appellant (mother of the juvenile).

*Judith M. Earl,* assistant attorney general, with whom, on the brief, was *Joseph I. Lieberman,* attorney general, for the appellee (commissioner of the department of children and youth services.)

BORDEN, J. This is an appeal[1] by the respondent mother from a judgment terminating her parental rights in the older of her two children, her daughter. The commissioner of children and youth services brought a termination petition pursuant to General Statutes § 17-43a, subsections (a) (2), (a) (3) and (a) (4).[2]

---

[1] This appeal, originally filed in the Supreme Court, was transferred to this court. Public Acts, Spec. Sess., June, 1983, No. 83-29, § 2 (c).

[2] General Statutes § 17-43a (a) provides in pertinent part: "In respect to any child committed to the commissioner of children and youth services in accordance with section 46b-129 . . . the commissioner . . . may petition the court for the termination of parental rights with reference to such child . . . . The superior court upon hearing and notice . . . may grant

The court found that the commissioner had sustained his burden of proof on each of the three grounds alleged in the petition.[3] As to the first ground, it found that the respondent has failed to achieve the statutorily required degree of personal rehabilitation in that she has failed to make a suitable plan for the child's care, has been unable properly to care for the child when the child visited overnight and has refused to become involved in learning parental skills. As to the second ground, it found that because of the respondent's continued mental deficiency, she is and, for a period of time which will be detrimental to the child's best interest, will continue to be unable to provide the child with the statutorily required guidance and control; she has a very low verbal I.Q. on the Wechsler Adult Intelligence Scale; she has shown an inability to provide minimal care for the child without close supervision and support; no placement has been found which will take both her and the child together and she has no next of kin who seems to be interested in her future. As to the third ground, it found that there is no ongoing parent-child relationship, as statutorily defined, and that to allow further time for the establishment of such a relation-

---

such petition if it finds, upon clear and convincing evidence, that over an extended period of time, which . . . shall not be less than one year . . . (2) the parents have failed to achieve any such degree of personal rehabilitation as would reasonably encourage the belief that at some future date they could assume a responsible position in their child's life; or (3) the parents, by reason of continuing physical or mental deficiency have, and for such period of time as will be detrimental to the best interest of the child, will be unable to provide him with the care, guidance and control necessary to his physical, educational, moral and emotional well-being; or (4) there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child . . . ."

[3] Although no formal evidence was introduced in the trial to indicate that the child was committed to the commissioner; see footnote 2, supra; it apparently is undisputed.

ship would be detrimental to the child's best interest; the child has been in the foster home of Mr. and Mrs. S since February 8, 1980; the respondent has visited the child infrequently and sporadically; and the child views Mr. and Mrs. S as her parents and does not recognize the respondent as her mother. The court thereupon ordered the respondent's parental rights terminated.

The respondent appealed, claiming that there was insufficient evidence to justify termination of parental rights.[4] We agree.[5]

## I

"The termination of parental rights is defined as 'the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent . . . .' General Statutes § 45-61b (g). It is 'a most serious and sensitive judicial action.' *Anonymous* v. *Norton,* 168 Conn. 421, 430, 362 A.2d 532, cert. denied, 423 U.S. 935, 96 S. Ct. 294, 46 L. Ed. 2d 268 (1975). 'Although that ultimate interference by the state in the parent-child relationship may be required under certain circumstances, the natural rights of parents in their children "undeniably warrants deference and, absent a powerful countervailing interest, protection." ' " (Citations omitted.) *In re Juvenile Appeal (Anonymous),* 181 Conn. 638, 640, 436 A.2d 290 (1980), quoting *In re Juvenile Appeal (Anonymous),* 177 Conn. 648, 671, 420 A.2d 875 (1979).

---

[4] After oral argument, the respondent withdrew her claim that the trial court erred in considering the contents of a report which was not introduced in evidence.

[5] We note, of course, that our decision does not mean that the child must now be returned to the respondent. The child remains committed to the commissioner. Any change in that status is governed by General Statutes § 46b-129. Our decision means only that at the time of this trial the commissioner did not establish grounds for termination of parental rights freeing the child for adoption. See General Statutes § 17-32d (e). Nor does our decision foreclose the possibility of a subsequent petition for termination of parental rights based on a different and current factual posture.

Compliance with the statutory criteria for termination cannot be dismissed by an all-encompassing "best interests" standard. *In re Juvenile Appeal (Anonymous),* 177 Conn. 648, 672, 420 A.2d 875 (1979). "Insistence upon strict compliance with the statutory criteria before termination of parental rights and subsequent adoption proceedings can occur is not inconsistent with concern for the best interests of the child. Rather, it enchances the child's best interests by promoting autonomous families and by reducing the dangers of arbitrary and biased decisions amounting to state intrusion disguised under the rubric of the child's 'best interests.' " Id. "[T]he risk that judges or social workers will be tempted, consciously or unconsciously, to compare unfavorably the material advantages of the child's natural parents with those of prospective adoptive parents and therefore to reach a result based on such comparisons rather than on the statutory criteria" requires the court, "in considering a petition to terminate parental rights, to sever completely the issue of whether termination is statutorily warranted and whether a proposed adoption is desirable"; id., 672–73; although evidence as to the child's relationship with the foster parents and their availability and suitability as adoptive parents is relevant to the issue of the child's best interest under General Statutes § 17-43a (a) (4). *In re Juvenile Appeal (Anonymous),* 181 Conn. 638, 646, 436 A.2d 290 (1980).

General Statutes § 17-43a specifies those instances which may justify the termination of parental rights in the absence of consent. The commissioner must allege and prove, by clear and convincing evidence, one or more of the statutory grounds. *In re Juvenile Appeal (83–CD),* 189 Conn. 276, 296, 455 A.2d 1313 (1983). The "clear and convincing" burden of proof is constitutionally mandated. *Santosky* v. *Kramer,* 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). It refers to a stand-

ard of proof that is between the standard required in an ordinary civil action and that required to find criminal guilt. *Dacey* v. *Connecticut Bar Assn.*, 170 Conn. 520, 536–37, 368 A.2d 125 (1976). There must be "more than average certainty on the part of the factfinder." *Santosky* v. *Kramer*, supra, 758; *In re Juvenile Appeal (83–CD)*, supra, 297.

## II

The hearing in the trial court lasted over a period of four days in October and November, 1981. The court found the following significant subordinate facts. At the time of the child's birth on February 4, 1980, the respondent was herself committed to the department of children and youth services (DCYS). The child was conceived while the respondent was at Stone Gate School, a residential treatment center for the retarded. The respondent was placed there because she could not cope with the rigors of a regular school system. Four days after her birth the child was placed in foster care in the S home. The respondent has visited the child very infrequently. Mrs. S, with whom the child has lived almost her entire life, loves the child greatly and wishes to adopt her. The child refers to Mr. and Mrs. S as "mommy" and "daddy" and does not refer to the respondent, who is foreign to her. The respondent became pregnant again while residing with her aunt shortly after her release from the maternity hospital. She was then placed in a foster home in Hartford. The respondent gave birth to her second child, a son, on September 4, 1981, and was eventually placed in the teenage parent program (TAP) of the Hartford school system. The trial court further found that because of her borderline intelligence, prior personal history, inability to obtain family support and the necessity of continued outside support, the respondent, who does not have the capacity to cope with the general tasks of

everyday living, would be unable reasonably to provide minimum care for the child without continual and extensive support.

Because the trial court found all three grounds for termination, because we find that specific critical findings of the trial court are not supported by the evidence, because much of the evidence bears on more than one statutory ground, and because we conclude that none of the grounds for termination was supported by sufficient evidence, we find it necessary to summarize the evidence before the trial court.

## A

The commissioner's case in chief consisted of testimony from four witnesses. The first was Mrs. St, a foster mother with whom the child was placed for about three weeks in April, 1981. She testified essentially as follows. When Mr. and Mrs. S visited the child at her home, the child, age fifteen months at that time, was happy to see them and sad when they left. The respondent did not contact her but, in a visit arranged by the DCYS caseworker, she visited the child, who cried when the respondent was there. The child did not cry when other people came to see her.

Mrs. S, the principal foster mother, testified essentially as follows. The child has been in her home in Plainfield for twenty months, from four days after her birth, except for approximately three weeks when she was with Mrs. St. The placement with Mrs. St was at Mrs. S's request. When the child was one and one-half months old Mrs. S, who has an adopted boy, was told by the caseworker that DCYS was going to move for termination. When the child was fourteen months old, she and Mr. S were told they could not adopt her because they were not black. She therefore asked that the child be placed with someone by whom she could be adopted, in order to get used to living with a black

family. After the child was removed, she was told that if and when the termination was accomplished she would be able to adopt her. She loves the child a great deal. If termination is accomplished she plans to try to adopt the child, but if she cannot she is willing to keep the child in her foster care indefinitely. The child calls her "mommy" and does not refer to the respondent. The child, who had a congenital hip problem which is now healed, is normal.

She also testified to the course and nature of the respondent's visits with the child. For the first three or four months the respondent visited the child once a month, then once every two months, and she last saw the child in April, 1981, at the DCYS office in Norwich, an unfamiliar place for the child. At first the child did not want to go to the respondent but then she did and they played together. When Mrs. S was in the room with the child and the respondent, the child would react normally. About two months prior to this hearing, just before her second child was born, the respondent called to arrange a visit but it could not be arranged. When the respondent would visit the child at Mrs. S's home the child would be withdrawn until she saw Mrs. S and the respondent talking. The respondent would try to play with her, was patient in dressing and talking with her and, after the first couple of visits, the child would go to the respondent. Mrs. S regarded this as natural behavior by a young child who is not familiar with someone. The respondent was capable of changing the child's diaper and feeding her, and on visits would bring clothes, jewelry and toys to the child and ask about the child's health.

There were several overnight visits. When the child was about two months old the respondent took her over a weekend to be baptized. At Thanksgiving of 1980, the respondent had the child for four or five days. When the respondent returned she looked tired. She said, with

no abundance of enthusiasm, that the visit had gone all right, and after that did not visit the child as often. There was one other day-long visit. Mrs. S feels that the respondent loves the child very much, in her own way, but does not show maternal instincts, warmth or any special mother-child rapport, and would be happy to see the child and play with her for a few minutes but seemed relieved when it was time to leave.

Nancy Burnett, the DCYS social worker for the child since February, 1981, testified essentially as follows. When she got the case in February, 1981, an administrative decision to seek termination had already been made, after which she did not encourage visitation but would arrange for it when requested by the respondent. There were two such visitations since then: at Mrs. S's house, requested by the respondent, and at the DCYS office in Norwich. The respondent requested a visit to TAP on "baby day," which DCYS declined because they felt visitation should be in the foster home. When the respondent visited the child at the S home, the child cried in the respondent's presence and would not leave Mrs. S's lap. At the DCYS visit the respondent was more relaxed, and the child played with her but would return to the room to be sure that Mrs. S was still there. The relationship between Mrs. S and the child was very relaxed and natural.

Burnett also testified to the respondent's history. In February, 1981, the respondent was at her aunt's house, but left at the aunt's request because she had become pregnant with her second child. From there she was placed in the foster care of D, but had to leave. Burnett tried unsuccessfully to find a placement which would accept both the respondent and her expected baby. The respondent herself made arrangements to stay with an elderly woman with whom she had stayed in earlier years, who was willing to take in the respondent and her second child.

The respondent, now age eighteen, has been committed to the commissioner, her statutory parent, since age six or seven. In 1976 she was placed at Stone Gate School, a residential center for retarded children, because her then foster parent was not able to cope with her behavior, because she was having academic difficulty in the regular school system and because testing had been done indicating that as an appropriate placement. She has had an unsettled family life from birth to the present.

Burnett also testified to the course of visitation with the child. Before Burnett's involvement with the case the respondent had visited the child once per month, in accordance with the DCYS written plan providing for such visitation if the respondent could get a ride from Groton, where she was living, to Plainfield. The respondent had the child for overnight visits on Halloween, Thanksgiving and from December 30 through January 4. Her aunt said the Thanksgiving visit went well, although the respondent would get nervous when the child fussed. Two other women, with whom the respondent stayed overnight with the child, told Burnett that the respondent did well with the child when strictly supervised but that neither felt comfortable leaving her alone with the child. She would need very close supervision when she had the child in her possession. Burnett had made no efforts to find a place where the respondent could have both her children with her.

Although the respondent is now age eighteen, she will remain under DCYS care until age twenty-one as long as she is in an academic program. She is now attending TAP, the thrust of which is improving parenting skills.

The commissioner's fourth witness was D, who testified briefly, essentially as follows. The respondent was in

her foster care at two different times, including February to July 1981. She has four other foster children, with whom the respondent got along well, although they had normal teenage differences of opinion. D had complained, in anger, to Burnett about the respondent, including an opinion about the respondent's ability to care for children. The respondent had a good relationship with a two year old in her home, and she would feel comfortable about the respondent caring for and raising that child. D further testified that the respondent has grown up and is able to care for children of her own.

### B

The respondent's case consisted of six witnesses. The first was Janet Jackson, the respondent's social worker at Child and Family Services (CFS) in Hartford. She testified essentially as follows. The respondent is enrolled in the CFS parenting program, which provides her with a parent aide at her home once per week, who teaches her budgeting, planning and preparing meals, role modeling and the wise use of time. The respondent is receptive to this program, has impressed everyone with her ability to follow through on goals, is motivated and recognizes this as part of her goals both of caring for her second child and of having her first child with her. She cares for her second child very well. He is clean and well groomed, and there is good bonding and appropriate nurturing. The respondent will continue to need the support she is now getting, but not indefinitely. Jackson could not estimate when the respondent would not need supportive services. Eventually she will be fine on her own with her second child; in about eight to ten months she will not need an intensive support system; she will then need much less support; Jackson could not, however, predict when the respondent will be self-sufficient. While it would be difficult for the respondent to care for both children now,

and difficult to predict when she could do so, it is not out of the question that she could do so within eight months. She has demonstrated excellent abilities in caring for her second child without daily support, doing all the things mothers of newborn babies are supposed to do such as feeding, clothing, making babysitting arrangements and taking care of bottles and formula. She is making very firm progress toward being able to care for both children and there is a good potential that she will be able to live independently and provide such care.

Mary Halsdorff, a psychologist at CFS, testified essentially as follows. She saw the respondent on September 14, 1981, to assess her parenting skills and level of functioning. The respondent has acquired much knowledge and practical information on parenting at TAP. Her parenting approach is appropriate and she is a good parent to her second child. It would be very hard for the respondent to handle two children, but there is nothing to indicate that she could not do it. The resources available to her enhance the chances of her being able to parent two children. The respondent is not now capable of caring for both her children, and Halsdorff could not predict when she would be capable of doing so. She needs time to develop her parenting skills, to be introduced to the child and to have the child get to know her. This would require a specific plan of gradually increasing visitation, so both can get to know each other and establish emotional connections. The respondent's mental capabilities have nothing to do with this readjustment.

Halsdorff had access only to a summary of the respondent's prior I.Q. tests, which indicated a borderline intellectual capability in the range of 70–79. This does not, however, prohibit a person from functioning and carrying on a fairly normal life. People in that range tend to be concrete but do function fairly well.

The respondent has no personality disorganization or psychopathology.

Arthur Pfeiffer, a school psychologist for the city of Hartford who had tested the respondent about one month prior, testified essentially as follows. The test he administered had two parts: verbal and performance (nonverbal). The verbal score was 74, within the borderline range; her performance score was 109, or clearly average. The difference between the two was significant, indicating a real difference between her abilities to express herself verbally and nonverbally, and indicating a pattern found in persons who have not had the experience or education to sharpen their verbal skills. There was a significant change from prior testing results, indicating a trend toward greater intellectual potential. The verbal pattern of the test was contrary to that of a person who is educably mentally retarded; the verbal pattern and the nonverbal score show her to be well within average limits on either a verbal or nonverbal basis. She has the intellectual ability to have a normal life in society as an independent adult. She is not mentally retarded.

Mary King, a social worker at TAP, testified essentailly as follows. TAP combines an academic program, social service support, academic counseling, instruction in child and health care, and related services relative to parenting. The respondent has participated in TAP since March, 1981, attends regularly and can remain in it until June, 1982. She puts to use in her home what she has learned at TAP: appropriate rapport with her son; warmth, love and patience. Her son is neat, clean, goes to medical appointments and appears happy and content. The respondent, who is easygoing and gentle with her son, is making progress in parenting skills; she has more growing to do, but that will come with age, maturity and experience; she is headed in the direction of being able to function without TAP and with

minimal support. While it is difficult for her to care properly for two children now, if she continues to get the support that she is presently getting she can reach the point where she can handle two children. Eventually she will be able to function with minimal support.

Barbara Eaton, the respondent's DCYS counselor since July, testified essentially as follows. The respondent is doing a good job as parent of her son and can care for him with minimal support. She is not now capable of caring for both children, but is making progress toward being able to do so. With minimal, not intensive, support she would be able to function as mother to both children within six months to a year. She is highly motivated to caring for her child. She has no special needs other than someone to help her believe that she can do for herself and be responsible for her own life. Over a period of time she will need no support.

The commissioner next recalled Mary King in rebuttal, who testified essentially as follows. From the time of the previous hearing day the respondent had left TAP and moved to New London to live with her sister. She plans to continue school, locate a babysitter for her son and contact medical facilities in New London. King was disturbed at this change because, although the respondent had in the past discussed her long range plan to move back to New London to be near her family, she was doing so without the supports being in place and King wanted to be available to make the transition easier for her. King would be less disturbed if she knew that the respondent was receiving, in New London, support services comparable to those in Hartford, which are available in New London.

The respondent was the final witness. She testified essentially as follows. She moved to New London one week prior and is living with a former girlfriend of her father and the friend's four children. She knows this

woman from having lived with her for about one year when she was younger. She and her son have a room to themselves. She is attending a program very much like TAP, except that it also has a nursery so that she can bring her son with her rather than leave him with a babysitter. She has arranged for medical care for him; the school nurse will visit her at her home weekly, like the parent aide at CFS in Hartford; she intends to contact CFS in new London; and she has arranged for her state welfare benefits to be transferred to New London. She is familiar with New London, would in the past go there from Hartford on weekends, wants to attend school there and plans to live there indefinitely. She plans to get her own apartment. Her father lives with her aunt in Groton.

## III

### A

The first ground for termination found by the trial court was that the respondent has failed to achieve any such degree of personal rehabilitation as would reasonably encourage the belief that at some future date she could assume a responsible position in the child's life. General Statutes § 17-43a (a) (2). "Rehabilitate" means "to restore [a handicapped or delinquent person] to a useful and constructive place in society through social rehabilitation." Webster, Third New International Dictionary. The statute does not require the respondent to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life.

Certain findings of the trial court, if supported by the evidence, would have justified a finding of termination under this standard. These are that, because of her borderline intelligence, prior personal history, inability to obtain family support and the necessity for continued outside support, she would be unable reasonably to provide minimum care for the child; that she does not have the simple capacities to cope with the general tasks of everyday living; that she has been unable properly to care for the child on overnight visits; and that she refused to become involved in learning parental skills. Our review, however, of the evidence in this case, summarized above, indicates to us that those findings are not supported by the evidence and are, in light of the evidence in the whole record, clearly erroneous. *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221–22, 435 A.2d 24 (1980).

### B

The second ground for termination found by the trial court was that the respondent, by reason of continuing mental deficiency, has been and, for such period of time as will be detrimental to the best interest of the child, will be unable to provide the child with the care, guidance and control necessary to the child's physical, educational, moral and emotional well-being. General Statutes § 17-43a (a) (3). This part of the statute required the court first to find that the respondent suffered from a continuing mental deficiency. *In re Juvenile Appeal (83–BC),* 189 Conn. 66, 76, 454 A.2d 1262 (1983). The testimony of Halsdorff, summarized above, and relied on by the trial court for its finding in this regard, simply does not support such a finding. Nor does the testimony of Pfeiffer. Indeed, the clear thrust of both sets of testimony is to the contrary. The only other evidence which could raise an inference of mental deficiency was the respondent's placement in Stone Gate School at age eleven because of her then

foster parent's inability to cope with her behavior, because of her academic difficulty in the regular school system and because testing indicated that as an appropriate placement. The evidence was insufficient to justify a finding that the respondent now suffers from a continuing mental deficiency. In view of our conclusion on the first element of General Statutes § 17-43a (a) (3), we need not reach the second element, which required the trial court to find that, because of her continuing mental deficiency, the respondent was incapable of adequately providing for the child.

## C

Finally, the trial court found that there was no ongoing parent-child relationship and that to allow further time for the establishment of such a relationship would be detrimental to the best interest of the child. General Statutes § 17-43a (a) (4). This part of the statute requires the trial court to make a two-pronged determination. First, there must be a determination that no parent-child relationship exists; and second, the court must look into the future and determine whether it would be detrimental to the child's best interests to allow time for such a relationship to develop. *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 670, 420 A.2d 875 (1979).

"It is reasonable to read the language of 'no ongoing parent-child relationship' to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced. In either case the ultimate question is whether the child has no present memories or feeling for the natural mother." Id. The respondent concedes, and our review of the evi-

dence confirms, that the trial court did not err in finding that there was no parent-child relationship.

The court was then required to determine whether it would be in the child's best interest to allow further time for the establishment of such a relationship. The "best interest" standard, therefore, does not become relevant until after it has been determined that no parent-child relationship exists. Id., 675.

There was insufficient evidence from which the trial court could find that it would be detrimental to the child's best interests to allow further time for the development of a parent-child relationship. There was evidence as to the relationship with Mr. and Mrs. S and their availability and suitability as foster parents, which was relevant to the issue of the child's best interests. *In re Juvenile Appeal (Anonymous),* 181 Conn. 638, 646, 436 A.2d 290 (1980). That relevant evidence, however, in and of itself, is an insufficient basis on which to find that it would be detrimental to the child's best interests to allow further time to allow the natural parent-child relationship to develop. To hold otherwise would be to "make child placement a trap for the unwary." Id., 649 *(Parskey, J.,* dissenting).

"It is clear that the legislature intended that even without fault on the part of the parent a child should be able to be freed for adoption where there is no ongoing child-parent relationship *and where the period of time predictably necessary to establish or re-establish a parent-child relationship with the natural parent would be detrimental to the child's best interest."* (Emphasis added.) Id., 645. There was insufficient evidence from which the court could find what that period of time was, or that there was no such predictable period of time; and insufficient evidence from which

the court could find that to allow that period of time to elapse would be contrary to the child's best interests.[6]

There is error, the judgment is vacated and the case is remanded with direction to render judgment for the respondent.

[6] Compare, for example, the evidence adduced by the commissioner in *In re Juvenile Appeal (Anonymous)*, 181 Conn. 638, 436 A.2d 290 (1980). There a clinical psychologist who had evaluated the natural mother, the child and the foster parents, testified that the natural mother's immaturity would be an increasing handicap as the child grew older; that she was vulnerable to stress and prone to make unrealistic demands for support; that it was doubtful that she would change in the future; that these traits would increase under stress; that the child involved would be at high risk in her family; that an abortive return to the mother's home would exacerbate the child's feelings of rejection; that the child had developed a strong psychological bond with his foster parents; and that the child required continuity and permanence, which could best be achieved by terminating the mother's parental rights. Id., 642–46. The trial court there specifically found, furthermore, that to remove the child from the foster home or to delay further the permanency he required would be inconsistent with his best interests. Id., 646. In this case there is no comparable evidence or finding.