[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The Department of Children and Families (DCF) filed termination of parental rights petitions with respect to Morgan E. and Emily E., twin sisters who were born on December 5, 1994. Gretchen E., the children's biological mother, and Charles S., their biological father, were named as respondents in this action. (The parents were never married to each other.)
The termination petitions were filed with the Superior Court for Juvenile Matters in Montville on October 29, 1996, and were appropriately served upon each respondent. Each party had notice of the proceeding, and appeared herein through their respective counsel. Accordingly, the Superior Court for Juvenile Matters has jurisdiction in this case. The matter was transferred from the court in Montville to this venue for trial.
In each of its original petitions, DCF alleged three non-consensual grounds for termination under C.G.S. § 17a-112
against each parent: abandonment, parental failure to rehabilitate, and no ongoing parent-child relationship. On the first day of trial — February 18, 1997 — DCF moved to amend its petitions by deleting the counts of abandonment and no-ongoing parent-child relationship. All parties agreed to the amendment, and the motion was granted by the court. A contested trial on the remaining count was held on February 18-19.
The respondent, Gretchen E., was present in court on each day of the trial and was represented throughout the proceeding by her counsel. Charles S., the respondent father, elected not to attend the trial but was represented throughout it by his counsel. Charles S. had indicated his desire not to participate in the trial at a prior hearing before the Honorable Francis J. Foley, and Judge Foley excused the father from attendance. At the outset of the trial on February 18, the father's counsel, Atty. Maureen Chiemielecki, again indicated on the record that Charles S. was aware of the proceeding, had elected not to attend it, and understood the ramifications of this decision. DCF and the minor children were also represented by their respective attorneys during the entire proceeding.
The petitioner introduced the testimony of the following witnesses at trial: CT Page 2705
1. Jennifer Julian, DCF social worker;
2. Saralyn Savage, DCF social worker;
3. David Mantell, PhD, court-appointed evaluator;
4. Laurie S., the children's foster mother;
5. Kristina Poly, DCF social worker;
Counsel for Charles S. also called DCF social worker Kristina Poly as a witness during the respondent father's case in chief. Gretchen E. testified on her own behalf, but did not offer any other witnesses. Counsel for the minor child did not present the testimony of any witnesses.
FACTUAL FINDINGS
The court, having carefully considered all of the evidence and testimony adduced at trial, makes the following factual findings:
Emily and Morgan were born on December 5, 1994. Both children were born prematurely after 33 weeks' gestation, and had birth weights of approximately three pounds. Each child tested positive for cocaine at birth. (Testimony of Jennifer Julian).
Gretchen E. initially stated that she had used cocaine only once during her pregnancy. She later admitted that she had smoked crack cocaine, which was supplied to her by the children's father, throughout her pregnancy. (Respondent Father's Exhibit 1, Page 2). Both of the respondent parents have unfortunate histories of longstanding substance abuse.
The petitioner initiated a neglect proceeding and requested ex parte orders for temporary custody of Emily and Morgan on December 23, 1994. The OTCs were granted on that date and the children were placed in the state-licensed foster home of Danny and Laurie S., where they have remained continuously since then. The twins were committed to DCF as neglected on January 10, 1995 at a hearing before the Superior Court for Juvenile Matters in Montville. Court-approved expectations of each parent were entered at this hearing. Those expectations indicated Gretchen E. and Charles S. were to abide by the following conditions: CT Page 2706
 "— Keep all appointments set by/with DCYS[1]. Keep whereabouts known to DCYS and your attorney.
— Visit the child(ren) as often as DCYS permits.
 — Participate in counseling: Drug/Alcohol. Continue to participate in treatment.
— Secure/maintain adequate housing and income.
— No substance abuse."
(Petitioner's Exhibit 3).
Although the document setting forth those expectations was not signed by either party, court records of which this court takes judicial notice indicate that both parents were present in court on the date of the commitment hearing.
During the period of time from the date of commitment until May 1995, the respondent mother was offered weekly supervised visits with the children, and the father was permitted one supervised visit with the twins each month. The mother visited the children nine times during that period, and the father had two visits. (Petitioner's Exhibit 7).
Given each respondent's history of substance abuse, DCF's primary rehabilitative focus was on drug treatment. Gretchen E. entered an in-patient group treatment program known as S.C.A.D.D. which she successfully completed on December 30, 1994. (Respondent Mother's Exhibit B). Around the time she finished at S.C.A.D.D., the mother entered a two-month residential program at the Boneski Treatment Center in Norwich, from which she was successfully discharged on February 24, 1995 (Respondent Mother's Exhibits C, D, E, and F). While a patient at Boneski, Gretchen E. made "significant progress toward her treatment goals and objectives." (Respondent Mother's Exhibit D). Records from that facility indicated that Gretchen E. "has obtained a sponsor, has verbalized she will attend 12-step meetings and has sufficient stress management techniques to live a sober lifestyle." (Respondent Mother's Exhibit D). Judith Haberek, a social worker and certified alcohol/drug counselor at Boneski, wrote:
"To the degree [mother] enmeshes herself with 12-Step CT Page 2707 meetings and program philosophy will be the degree she will be successful." (Respondent Mother's Exhibit D).
Upon discharge from Boneski, Gretchen E. enrolled for follow-up outpatient drug treatment with a program operated by Elmcrest Hospital (Care Plus). She was in this partial hospitalization after-care program from March 7, 1995 until April 18, 1995. (Respondent Father's Exhibit 5, Page 1). The discharge summary from Care Plus noted that Gretchen E. "presented with an 18-year history of substance dependence and at least a 10 year history of depressive symptoms." (Respondent Father's Exhibit 5, Page 2). During the course of her participation at Care Plus, the respondent made some strides in dealing with her problem, including daily attendance at AA or NA meetings, and active involvement with a sponsor. (Respondent Father's Exhibit 5, Page 2). But there were also indications that she was continuing to engage in both substance abuse and denial. The Care Plus discharge summary noted that Gretchen E. had relapsed on one occasion by using drugs and then "asked another patient to switch urines with her in order to avoid detection of that." (Respondent Father's Exhibit 5, Page 2, Petitioner's Exhibit). A summary of her condition on discharge indicated that Gretchen E. had shown "gradual improvement" but also noted that she did not properly terminate from the program:
 "Instead of returning for her last day of treatment, she called in saying she had a dental emergency and would be in later that day, but did not return at all that day. She left a message stating that she would call her clinician in two days after that, but did not. At the time of this dictation, she had not contacted her clinician." (Respondent Father's Exhibit 5, Page 1).
On May 8, 1995, Gretchen E. attended a meeting which was held at the children's foster home. In addition to the biological mother, the foster mother and DCF social worker Saralyn Savage, representatives from a program known as the Birth to Three Program were also present. (Testimony of Laurie S. and Saralyn Savage). The purpose of the meeting was to discuss specialized services for the twins. During the meeting, Gretchen E. was described as being unfocused and unable to follow a conversation. She "sniffed" a number of times, blaming allergies. Ms. Savage testified at trial that on that day Gretchen E. did not act as CT Page 2708 she usually did. Laurie S., the foster mother, testified that Gretchen E. was "not with us" at the meeting. In light of the mother's demeanor at the meeting, and her past substance abuse history, Ms. Savage suspected that Gretchen E. was again taking illicit drugs. She confronted the mother, and suggested that she go that day for a drug screen. Gretchen E. denied that she was using illegal drugs, but refused the worker's request that she go for a test on May 8th. The respondent mother promised the worker that she would ask for a drug test the following day (May 9, 1995) when she went for an appointment which was scheduled at the Care Center in New London. Gretchen E. subsequently failed to keep that appointment on May 9th, and she never submitted to the drug analysis as she had promised to do.
After the mother failed to appear for drug testing, DCF imposed what it then felt would be a temporary suspension of her right to visit the twins at the foster home. DCF social worker Kristina Poly testified that DCF took this action because of the mother's failure to comply with court-ordered expectations, the suspicion that she was abusing drugs again, and the mother's refusal to submit to testing on May 8th and 9th. Laurie S., the foster mother, informed Gretchen E. of the suspension during a conversation on May 12th.
Following this conversation, the mother stopped visiting the children — who were then five months old — altogether. Gretchen E. has not visited Emily and Morgan since May of 1995. She made telephone calls to the foster mother sporadically from May 1995 until August 1995, when she ceased that form of contact. Gretchen E. has not sent cards or gifts to the twins since May of 1995. (Testimony of Laurie S.).
During her testimony at this trial, mother admitted that she had "disappeared" from the lives of her two young children. She testified that she was depressed, felt hopeless, and did not believe that there was anything she could do to get her visitation reinstated or reclaim the twins' custody from DCF. It was not until approximately September 1996, shortly after her current counsel was appointed, that the respondent mother made a formal motion for visitation.[2] Gretchen E. testified during this trial that she has been "clean and sober" since one week after the visitation stopped in May, 1995. She testified that she has attended AA or NA meetings twice a month, has a sponsor, and holds a peer-group type meeting with several other women at her home each week. CT Page 2709
The court does not ascribe great weight to respondent's uncorroborated testimony that she has avoided relapses since May of 1995, and has successfully overcome her drug addiction. In June 1995, Gretchen E. was arrested in New London on a charge of attempted possession of cocaine. (Testimony of Gretchen E., and Petitioner's Exhibit 2). This arrest was the result of a so-called "reverse sting" operation in which police officers posing as street-level drug dealers arrested persons who were attempting to purchase illegal drugs. The respondent attempted to minimize her arrest during this trial, testifying that she only had pocket change in her possession when she was arrested, and that she was falsely accused by the police. She also testified that the charge was not subsequently prosecuted. In response to a question by the court, however, the respondent stated that the charges were not nolled, but were dismissed after she took advantage of a statutory pre-trial diversionary program for alleged drug offenders wherein she performed community service.
When Gretchen E. completed her treatment with Care Plus, her therapists recommended that she enroll in ongoing after-care treatment with the Care Clinic. She did not successfully complete this treatment program. A September 29, 1995 letter addressed to the mother from Judith Morgan of Care Clinic, Inc. notes in pertinent part:
 "I have discussed your case with my clinical supervisor. It was decided that in view of your poor attendance a re-evaluation was in order.
 Therefore, if you wish to continue in therapy you should call. . . . prior to October 15th. If we do not hear from you by that date your case will be closed."
(Respondent Father's Exhibit 3).
DCF social worker Saralyn Savage testified that mother did not follow through with the aftercare recommended for her after May of 1995. The court finds that this was a significant failure on the part of the mother, particularly given the chronic nature of the addiction which compelled her to use cocaine throughout her pregnancy and which caused her to relapse — during and after rather extensive treatment — as outlined above.
The father, Charles S. visited Emily and Morgan only twice. CT Page 2710 He had supervised visits with the children at DCF offices on February 28, 1995 and March 21, 1995. (Petitioner's Exhibit 7). He has not seen nor contacted the children since then, and he has not sent them cards or gifts. Although he did receive some initial drug treatment, he has not overcome his longstanding addiction. As reflected in Petitioner's Exhibit 7, Charles S. was supposed to visit the children on April 28, 1995. He called DCF and indicated that he did not wish to visit because he was again on drugs and had used cocaine on April 24, April 25, and April 26. (Petitioner's Exhibit 7). Evidence introduced at trial proved that Charles S. continued to abuse drugs after the children were committed, and failed to follow through with a number treatment programs which were offered to him. (Petitioner's Exhibit 6).[3]
 ADJUDICATION (Based on facts as of October 29, 1996)
C.G.S. § 17a-112 (b)(2) sets forth the grounds for termination when parental failure to rehabilitate is alleged. The statute applies in those cases where:
 "The parents of a child who has been found by the superior court to have been neglected or uncared for have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the ages and needs of the child, they could assume a responsible position in the life of the child."
As employed in the above statute, the term "personal rehabilitation" has been defined to mean the restoration of a parent to his or her former useful and constructive role as parent. See In re Juvenile Appeal (84-3), 1 Conn. App. 463, 477,473 A.2d 795 cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984).
The evidence in this case established that both respondents continued to abuse drugs after Emily and Morgan were committed to DCF. Although Gretchen E. and Charles S. each successfully obtained some substance abuse treatment, they both failed to follow through with the aftercare therapy recommended for them. They were each offered timely and appropriate rehabilitative services by DCF and other agencies and treatment providers. (See Petitioner's Exhibit 6). Additionally, each respondent had been totally absent from the lives of these children for well over a year when the TPR petitions were initiated in October of 1996. CT Page 2711
The court is mindful that the petitioner has withdrawn the allegations of abandonment and no ongoing parent-child relationship which were initially lodged against each respondent. But counsel for DCF has argued that evidence concerning each parent's lack of visitation and contacts is relevant and material to the remaining counts of parental failure to rehabilitate. The court agrees. The personal rehabilitation referred to in C.G.S. § 17a-112 (b)(2) is that which would enable a respondent to again play a responsible role in the life of his or her child. Evidence that a respondent demonstrates a lack of interest in a child is clearly probative of his or her desire and capacity to rehabilitate and function as an appropriate parent.
The respondent mother has testified in this case that her depression, and her perception that she was being treated unfairly by a large and powerful governmental agency, caused her to drop out the children's lives since May, 1995. While the court has empathy for Gretchen E.'s emotional and substance abuse problems, these circumstances do not eliminate the stark reality that the respondent has been totally uninvolved with her children for nearly all of their young lives. Gretchen E. could have dealt immediately with the suspension of her visitation by taking a blood test, seeking administrative review, or by filing a timely motion for restoration of her visitation rights with the court. Furthermore, she could have demonstrated her affection and interest in the children through other available means. Parents who are hospitalized, incarcerated, deployed with the military or employed overseas still maintain meaningful relationships with children from whom they are physically separated. They do so through telephone calls, cards, letters, gifts, contacts with guardians, visits and other expressions of love and concern. The court believes that the respondent, had she chosen to do so, could have performed certain basic acts during the period in question which would indicated her interest in, and capacity for, habilitating a parental relationship with Emily and Morgan. Unfortunately, she did not do so.
Based on all of the forgoing, the court finds that DCF has proven by clear and convincing evidence that Gretchen E. and Charles S. each failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the ages and needs of Emily and Morgan, that they could assume a responsible position in the lives of these children. The court further finds as proven by clear and convincing evidence that this ground for termination CT Page 2712 had existed for not less than one year prior to the date when the TPR petitions were filed, and that DCF made reasonable efforts to reunify this family.
DISPOSITION (based on facts through the end of trial)
Having found that DCF has proven one of the grounds for termination, the court now addresses the issue of disposition. For a judgment of termination to enter, the court must find by clear and convincing evidence that such a disposition would be in the children's best interests.
As noted above, Emily and Morgan have resided continuously in their current foster home since they were discharged from the hospital on December 27, 1994. Gretchen E. visited the children a total of nine (9) times, and has not seen them (with the exception of at a court-ordered evaluation in November, 1996) since May of 1995. Charles S. had two supervised visits with the twins, and has had no contact with them since March 21, 1995.
The DCF social study notes that the children have bonded with their foster parents, who haven "taken care" of all of their needs. (Petitioner's Exhibit 2, Pages 7-8). There were initial concerns that both children were developmentally delayed. As a result, both children received services from a physical therapist, occupational therapist and speech therapist.
The social study notes with respect to Emily that:
 "At the time of placement, Emily had two brief episodes of apnea and there were some developmental concerns. Currently, Emily is still seen by Birth to Three to monitor her progress, however, she is almost on target and has made tremendous strides developmentally." (Petitioner's Exhibit 2, Page 7).
The social study indicates that Morgan was "very stiff" at the time of placement and that there were concerns about [her] "Central Nervous System functioning." (Petitioner's Exhibit 2, Page 7). It also states in pertinent part:
 "Morgan continues to be monitored by Birth to Three and although she no longer needs the constant services of a PT, OT or speech therapist, she is still somewhat delayed," (Petitioner's Exhibit 1, Page 7). CT Page 2713
In the social study, DCF social worker Kristina Poly notes that the foster parents "have worked closely with health care professionals to develop therapeutic techniques that have helped Morgan to bond more with people. As a result, she is a very happy little girl who loves to be held and is much less guarded and resistant to people." (Petitioner's Exhibit 2, Pages 7-8). Ms. Poly also wrote that the foster parents have been "strong advocates for the children" who have sought out services which could prove useful to their proper development.
Based on all of the forgoing, the court finds that the foster parents have provided a loving and nurturing home for Emily and Morgan, and are particularly sensitive to the developmental needs of these at-risk children.
Dr. David Mantell, a licensed psychologist, testified at trial about a court-ordered evaluation of the respondent mother, the children, and the foster parents which he conducted on November 12, 1996. Dr. Mantell's testimony and report, which the court finds to be credible, was considered by the court solely with respect to the issue of disposition in this matter. He noted that the twins did not recognize their biological mother when the evaluation began, and that there was ". . . no observed relationship between the mother and child."(Petitioner's Exhibit 4, Page 7). Dr Mantell also opined during his testimony at trial that Gretchen E., had "failed the test" of demonstrating parental rehabilitation as a result of her failure to complete recommended aftercare.
The court is not persuaded by Gretchen E.'s claim at trial that her pattern of participating in a weekly peer group meeting and attendance at two AA or NA meetings a month has enabled her to conquer her long-standing substance abuse problems and remain drug free. Her unwillingness to follow through with the recommended professional treatment, and her long absence from the lives of Emily and Morgan contradict that claim. The court also notes that after the TPR proceedings were initiated, the respondent mother was again offered the opportunity to take a drug test. The proposed test would have analyzed a follicle of the respondent's hair to determine if she had used illegal drugs within the past several months. Gretchen E. testified at trial that she refused to undergo the screening because she did not trust DCF.
The court finds, based on all the evidence introduced at CT Page 2714 trial, that both biological parents have been unsuccessful since December 1994 in achieving rehabilitation, and habilitating a relationship with Emily and Morgan. Given the children's ages, their developmental and other special needs, and the protracted length of time they have already spent in foster care, it would be totally adverse to their best interests to a!low either respondent additional time to pursue reunification.
Before this court may enter judgment in this matter, it is mandated by C.G.S. § 17a-112 (d) to make the following factual findings:
1. Services offered: The court finds as proven by clear and convincing evidence that timely and appropriate services, aimed at fostering reunification, were offered to each of the respondents. (See in particular Petitioner's Exhibits 1, 2, 6 and 7).
2. Reasonable efforts: The court finds, also by clear and convincing evidence, that through offers of visitation, casework services and services offered by other agencies and treatment providers, the petitioner made reasonable efforts to reunite Emily and Morgan with their biological parents.
3. Court orders: No court orders were entered in this case. Reasonable and appropriate court-approved expectations, which delineated what actions each respondent would have to undertake in order to achieve reunification, were entered by the court on January 10, 1995. (See Petitioner's Exhibit 3).
4. Feelings and emotional ties of children: Emily and Morgan have bonded with their foster parents, who have provided them for more than two years with the only home they have ever known. The biological father last visited the twins in March 1995, and has only seen the children during two visits. With the exception of the November 1996 evaluation, the twins last saw Gretchen E. in May of 1995. Dr. Mantell indicated that the children did not recognize the respondent mother, and that he observed no parent-child relationship. The court finds that neither child has any positive memories or recollections of either parent.
5. Efforts to Adjust: The court finds that neither of the biological parents has made significant efforts to adjust their circumstances, conduct or conditions so as to make it in the best interests of the children to return them to either parental home CT Page 2715 in the foreseeable future. In making this finding, the court has considered, inter alia, the contacts and communications which each respondent has had with the children, DCF and the foster parents since the date of commitment.
6. Age of Children: Emily and Morgan were born on December 5, 1994. They are approximately two years and three months old.
7. Impediments to parent-child relationship: The court finds that no unreasonable act of any individual or agency, and no adverse economic circumstance, prevented either respondent from maintaining a relationship with the minor children. In making this ruling, the court is mindful of the suspension of Gretchen E.'s visitation rights which the petitioner imposed in May 1995. Given the observed behavior of the respondent on the date in question, her prior history of substance abuse and denial, and her refusal to comply with drug testing, the court specifically finds that petitioner's actions in this regard were not unreasonable.
JUDGMENT AND ORDERS
Having considered the seven factors enumerated above, and having found as proven one of the grounds alleged against each respondent for the termination of their parental rights, the court further finds as proven by clear and convincing evidence that it is in the best interests of Emily E. and Morgan E. that each respondent's parental rights be terminated in order that these children may be freed for adoption.
Accordingly, it is hereby ORDERED that the parental rights of Gretchen E. and Charles S. with respect to Emily E. and Morgan E. be, and hereby are, terminated. It is further ordered that the Commissioner of the Department of Children and families be appointed the statutory parent of these children, for the purpose of securing an adoptive home or other appropriate permanent placement for them. Said Commissioner shall file with this court, no later than 90 days following the date of this judgment, a written report on the progress achieved towards such permanent placement. If adoption has not been finalized by June 1, 1998, then said Commissioner is further ordered to file a Motion for Review of Plan for Terminated Child, which shall be heard by the court no later than September 1, 1998.
Dated at Middletown, Connecticut this 11th day of March, CT Page 2716 1997.
BY THE COURT
DYER, J.