Memorandum of Decision
On October 14, 1998, the Department of Children and Families (DCF) filed petitions to terminate the parental rights of Stanley D., Sr., and Violet D. to their minor son, Stanley D., Jr.[2]
At about this time, the father filed a motion to revoke the child's commitment to DCF. A consolidated trial of these matters, along with DCF's motion to review the permanency plan and obtain related findings, took place in this court on September 13, 14, and 15 and October 19, 1999. For the reasons stated below, the court grants the termination petition and denies the motions to revoke and to review the permanency plan as moot.
 FACTS
The court finds the following facts and credits the following evidence. The father was twenty-five years old at the time of trial. He came from a family that had chronic issues of substance abuse, unsanitary living, family violence, abuse, and neglect. He did not complete high school although he later obtained a GED. At age sixteen, the father was convicted of failure to appear in court and second degree sexual assault for having sexual intercourse with a younger teenager. He received a prison sentence of five years suspended after two, and three years of probation. The father violated his probation in August, 1994 for having unsupervised contact with minors.
The mother was twenty-two years old at the time of trial. She reported a chaotic childhood in which her brother repeatedly raped her and her father physically abused her. She has a history of mental illness.
Stanley was born on November 17, 1994. The parents were living together at the time, although they never married. Stanley's pediatrician immediately placed Stanley in the temporary custody of DCF, which then obtained a court order of temporary custody. On June 15, 1995, the court adjudicated Stanley neglected and, on July 14, 1995, returned Stanley to the parents under DCF protective supervision.
In August, 1995, the mother left the father's residence because the father had physically abused her. In September, 1995, DCF referred the mother to a therapist. The mother did not keep her appointments. On April 18, 1996, the court committed Stanley to DCF custody for one year.[3]
CT Page 14161
During the summer of 1996, the father was convicted of breach of peace for threatening to kill a DCF worker. This conviction formed the grounds for a second violation of probation. The court sentenced the father to jail for thirty days. In February, 1998, the father was convicted of carrying a dangerous weapon and placed on probation again for two years. The current terms of his probation require him to obtain a sexual offender evaluation and prohibit him from residing with anyone under the age of sixteen.
In 1997, the father initially refused to allow a parent aide from a service agency to have access to his home. That same year, the father was discharged from the Catholic Charities therapy program because of poor attendance.[4] These events led DCF to suspend unsupervised visits with Stanley at the father's home. Also during this time period, a girlfriend of the father's reported that the father physically abused her. In August, 1997, the father, in threatening terms, refused to permit a DCF worker to inspect certain portions of his home, contrary to a court order that had been entered three days earlier for the purpose of allowing DCF to assess the proper level of visitation. The worker returned in October, 1997 and observed that the father had a number of dogs, including pit bulls, in the attic and basement, which were covered with dog feces. In 1998, the father completed a parenting and visitation program but initiated several angry outbursts at case workers and, in general, received mixed reviews concerning his ability to be a parent for Stanley.
From September, 1997 to July, 1998, and then in June and July, 1998, the father engaged the services of a licensed clinical social worker for individual therapy concerning his anxiety and lack of parenting skills. The father's progress favorably impressed the therapist. He would often travel three hours by bus and on foot to make appointments.
For the past three years, the father has been a hard-working, reliable employee of a small business. He is now living in a different home, which is clean and safe, with a girlfriend and her four children. The father has visited Stanley regularly at DCF offices and has shown affection for him. The father did not, however, give Stanley any present or card for his fourth birthday.
Between March and June, 1998, the father failed to keep three scheduled appointments and an open-ended opportunity to appear for a court-ordered psychological evaluation with Dr. Robert D. CT Page 14162 Meier. After he ultimately evaluated the father, Dr. Meier concluded that the father has a historical problem with anger that is not limited to his conflict with DCF and that the father lacked insight about the impact of his anger on Stanley and other persons. Dr. Meier recommended against further consideration of joint custody of Stanley with the mother. He also recommended that the father obtain anger management therapy. At trial, Dr. Meier explained that the father should have therapy with a psychologist or psychiatrist who is willing to deal with a hostile patient.
Between April, 1996, and the filing of the termination petition in October, 1998, the mother's whereabouts were unknown to DCF on several occasions. The mother did not complete or regularly attend counseling sessions and a domestic violence support program. She did not initially attend parenting classes. Later on, she maintained a job and an apartment. She also participated in a play group with Stanley and visited him regularly through DCF on other occasions. At the visits, the mother was physically appropriate with Stanley, but did not engage him in play or set limits for him. After the filing of the termination petition, DCF again referred the mother for counseling because of concerns that she was depressed or not focusing on her child. The mother did not follow through.
Stanley has been living in his current foster home, which is his second, since the beginning of 1997. He has received assistance and evaluations from Birth to Three and Head Start and appears to be developmentally on target. Neither parent has inquired of DCF about Stanley's progress in these programs. Although Stanley was excited to see his father at some visits, during several of the visits Stanley acted out in a physical nature and, after some visits, Stanley was oppositional and defiant. When talking to the DCF case worker, Stanley does not bring up the subject of his biological parents.
Stanley is very comfortable in the foster home. He calls his foster parents "Mommy" and "Daddy" and gets along well with the other foster children in the home. The foster parents, who did not testify in court, would like to adopt Stanley.
TERMINATION ADJUDICATION
A. Reunification
CT Page 14163
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." General Statutes § 17a-112 (c)(1).[5] In this case, DCF located the parents early in the case. DCF offered the mother the following services, through third party service providers, to facilitate reunification: substance abuse evaluation and testing, domestic violence counseling, supportive housing services, individual counseling, parenting education, supervised visitation, and transportation assistance. DCF offered the following services to the father: parenting education, supervised visitation, a parent aide, individual counseling, substance abuse evaluation and treatment, anger management sessions, domestic violence evaluation, and psychological evaluations. The court finds by clear and convincing evidence that these services and referrals by DCF constituted reasonable efforts to reunify the parents with their child.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael R., 49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied, 247 Conn. 919, 722 A.2d 807 (1998); General Statutes §17a-112 (c)(3). In this adjudicatory phase, the court is limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a).
There being no material amendments to the petition, the adjudicatory date in this case is October 14, 1998. DCF has alleged the ground of failure to rehabilitate against both parents. The court finds that DCF has proven this ground by clear and convincing evidence.
The ground of failure to rehabilitate arises when "the parent of a child who (1) has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112 (c)(3)(B)(1). No dispute exists that the court CT Page 14164 adjudicated Stanley neglected on June 15, 1995, thus satisfying one element of the statute.
The rest of the statute requires the court to find whether the parent has achieved "such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112 (c)(3)(B). The statute requires the court to analyze the parents' rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable "within a reasonable time." Inre Luis C., 210 Conn. 157, 167, 554 A.2d 722 (1989). The statute, however, does not require parents to "be able to assume full responsibility for [a] child, unaided by available support systems." In re Juvenile Appeal (84-3), 1 Conn. App. 463, 477,473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984). Because of the requirement that the court predict what will happen within a "reasonable time" after the filing of the termination petition, it is sensible to conclude that the court can consider not only the parents' conduct before the filing of the termination petition, but also their conduct after its filing.
During the adjudicatory period, and for a reasonable time thereafter, the father did not rehabilitate himself. The court cannot readily conclude that someone, such as the father here, who violates his criminal probation during the adjudicatory period has rehabilitated himself. The pendency of neglect and termination petitions is in a sense a probationary period for the right to have custody of a child and, if a parent has violated one probation, it becomes difficult to conclude that he has successfully completed the other. Further, the father's conviction for carrying a dangerous weapon after he had twice violated probation represents another flagrant and deliberate flouting of the law. The father, in fact, has a history of threatening and confrontational behavior with DCF workers and other service providers and of defiance of court orders. He cannot adequately teach a child the important lesson of respect for authority if he has so little respect himself.
The father also was discharged from a therapy program for poor attendance, failed to attend a psychological evaluation on numerous occasions, engaged in domestic violence, did not develop his parenting skills and, for a period of time, maintained a home CT Page 14165 that was unsafe and unsanitary for children. For all these reasons, DCF has proven failure to rehabilitate against the father by clear and convincing evidence.
The mother failed to rehabilitate herself primarily because she did not attend or complete a number of counseling programs and did not significantly benefit from the counseling she received. The mother's whereabouts were unknown early on, although she later became employed, maintained a job, and visited Stanley regularly. The mother, however, did not demonstrate that she could relate adequately as a parent to Stanley. When DCF referred her again to counseling because of concerns that she was depressed, the mother failed to follow through. The evidence clearly and convincingly establishes that the mother has not rehabilitated "as it relates to the needs of the particular child," In re Luis C., supra, 210 Conn. 167, and that, "within a reasonable time, considering the age and needs of the child, [the mother] could [not] assume a responsible position in the life of the child." General Statutes § 17a-112 (c)(3)(B).
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." General Statutes § 17a-112 (c)(2). The court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5.
The court was not persuaded by the testimony of the father's clinical social worker that the father has recently made progress in addressing his anxiety and other problems. It is true that the father is a hard worker and that he showed genuine commitment in attending appointments with his therapist. Unfortunately, the father did not show that same commitment to attending DCF-referred programs or court-ordered psychological evaluations. The court fully credits the testimony of Dr. Meier that the father has deep-seated anger that he still needs to address in a more rigorous therapeutic setting. The father's long history of disrespect for persons in authority and the willful nature of his criminal law violations gives this court little confidence that the father would present an appropriate role model for Stanley.
The mother is a more sympathetic figure, but she still lacks the parenting skills necessary to raise a five year old boy. CT Page 14166 There are also lingering questions about her mental health. The mother was offered numerous opportunities to obtain help, but she did not take advantage of them.
The parents have a visiting relationship with Stanley, but they have not been sensitive to his special needs, such as his birthday or his developmental programs. Stanley in fact has made good progress developmentally in his current foster home. He considers himself part of that family. Although it would have assisted the court if the foster parents had testified, the evidence is nonetheless clear that they would like to adopt Stanley. Adoption will hopefully provide him the permanent, safe, and nurturing home to which he is entitled. For all these reasons, Stanley's best interest clearly and convincingly favors termination of his natural parents' rights.
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112 (e). See In re Tabitha P., 39 Conn. App. 353,362, 664 A.2d 1168 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the court finds that DCF offered both parents visitation, individual counseling, parenting classes, and substance abuse evaluations. In addition, DCF provided housing and transportation assistance to the mother and referred her to domestic violence counseling. DCF referred the father to anger management counseling, domestic violence and psychological evaluations, and provided a parent aide. These services were relevant to the parent's needs and were offered in a timely manner.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF offered the parents appropriate services and guidance, and sufficient time to permit family reunification.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the CT Page 14167 extent to which all parties have fulfilled their obligations under such order.
On July 14, 1995, at the commencement of protective supervision, the court entered the following expectations for the parents to meet: (1) keep all appointments set by or with DCF, (2) keep whereabouts known to DCF and your attorney, (3) permit announced and unannounced visits by DCF, (4) participate in counseling (parenting, including a parent aide, and family), and 5) no further involvement with the criminal justice system.
On July 8, 1997, during the time of the child's commitment to DCF, the court entered the following additional expectations for the father: allow the parent aide to have access to the entire home, participate in individual counseling and provide a detailed report to DCF from the therapist, provide additional information concerning the father's recent arrest for criminal weapon possession and carrying a dangerous weapon, do not have guns in the home, permit inspection on August 11, 1997 of the father's entire residence for safety and sanitation purposes, and do not leave Stanley in the care of any other individual during visits. If the father complied with these expectations, DCF was to resume unsupervised visitation at the home. As detailed above, the father's compliance with the expectations was poor, particularly because of his criminal convictions, his initial failure to complete counseling, and his failure to cooperate with DCF workers and service providers seeking access to his home.
On September 29, 1997, the court imposed the following additional expectations for the mother to meet: visit Stanley as often as DCF permits, complete parenting classes, obtain individual counseling, secure/maintain adequate housing and income, no substance abuse, no involvement with the criminal justice system, and pursue housing at the Thames River Family Program. As detailed above, the mother complied with the expectations to avoid criminal justice involvement and substance abuse, to maintain adequate housing and income, and to visit Stanley regularly, but did not comply with the expectations of keeping her whereabouts known and participating in social service programs needed for her own development. As set out above, DCF substantially met its obligation to provide assistance.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at CT Page 14168 least one year and with whom the child has developed significant emotional ties.
As stated above, Stanley knows his parents but does not seem bonded to them. Stanley seems attached to his foster parents.
5) The age of the child.
Stanley is almost five years old.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that the parents have maintained regular visitation with Stanley, but they have not regularly given him cards or gifts. The mother failed to maintain contact with DCF for several periods of time and the father was hostile in his contact with DCF. In general, as explained above, the parents have not adjusted their circumstances to make it in the best interest of Stanley to return to either of their homes.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
As discussed above, the parents' difficulties stem from their own lifestyle choices or personalities and are not the result of the unreasonable acts of other persons or economic circumstances. The mother did encounter domestic violence from the father but, to her credit, left the father's residence early in this case.
CONCLUSION
Based upon the foregoing findings, the court determines that it is in the best interest of Stanley D. for a termination of CT Page 14169 parental rights to enter with respect to the father, Stanley D., Sr., and the mother, Violet D. Accordingly, the court hereby grants the termination petition. The court further orders that the Commissioner of DCF is appointed statutory parent for the children for the purpose of securing an adoptive family. The Commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law. The motions to revoke the commitment and to review the permanency plan are denied as moot.
It is so ordered.
Carl J. Schuman Judge, Superior Court