MEMORANDUM OF DECISION
This case presents a petition for the termination of the parental rights of Nancy S. to her daughter, Jessica, now age eight. Jessica's father died in 1993. Jessica was committed to the care of the Department of Children and Families (hereafter the "Department") on August 24, 1994, as a "neglected" child, having previously been in the temporary custody of her paternal grandfather pursuant to an order of the Probate Court. The difficulties in the family came to the attention of the Department as a result of a psychotic episode in Nancy's life in June of 1993, brought on by her underlying long standing mental illness. Since that event, Jessica has lived with her grandparents, who are willing to adopt her.
On September 22, 1995, the Department filed the petition for termination of Nancy S.'s parental rights to Jessica. The Department alleges that Jessica has previously been adjudicated neglected and her mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering Jessica's age and needs, she could assume a responsible position in her life. Connecticut General Statutes § 17a-112(c)(3)(B). It further alleges parental acts of omission or commission, but did not proceed at trial on that ground. The court finds that the mother has appeared and has a court appointed attorney, who vigorously contested the Department's claims. Jessica is represented and has had a guardian ad litem appointed for her. The court has jurisdiction in this matter and there is no pending action in any other court affecting custody of Jessica.
The court, having read the verified petition, the social studies, the numerous exhibits entered into evidence including the reports of the many evaluators of the mother and the child and having heard the testimony of many witnesses during four days of trial, makes the following findings:
A. PRE-PETITION FACTS: (September 22, 1995)
Jessica was born on September 10, 1989 to Nancy S. Some months after her birth, on January 21, 1990, Nancy and Jessica's CT Page 13574 father, Paul S. were married. Their marriage was stormy and short-lived. Paul began to consume alcohol to excess. The family experienced financial and other problems which grew worse in late 1992 and early 1993. As a result of an incident of physical violence, Paul was subject to a restraining order secured by Nancy from the Superior Court which barred him from the family home. On April 27, 1993, Paul, then twenty-nine years of age, was found dead in his car in a parking lot. An autopsy revealed he died from complications of cirrhosis of the liver, although Nancy has from time to time stated that he died of a drug overdose.
The episode which started the chain of events culminating in this litigation happened in early June of 1993. Nancy and her daughter, Jessica, were on Route 95 in Providence, Rhode Island, when Nancy's car ran out of gas. She and Jessica hitchhiked along the interstate highway and were then brought to the Providence Police Department by a passing motorist. At that time, Jessica had no jacket and was barefooted. Nancy's statements, both to the Police and the hospital workers when she and Jessica were transported to the hospital, were incoherent. Due to her mental state, she was unable to give any of the officials a telephone number of someone who could come to assist them. The Rhode Island child protection agency was notified and in the early morning hours of June 5, 1993, Fred and Jean S., Jessica's paternal grandparents, came to retrieve their granddaughter from the hospital.
On June 8, 1993, Fred S. filed a petition with the local Probate Court for termination of Nancy S.'s parental rights to Jessica. On that date, he was awarded immediate temporary custody of Jessica. On August 12, 1993, the petition was transferred to this court by motion of the child's attorney. On August 19, 1993, the Department filed a neglect petition which was heard by the court and granted after trial on August 24, 1994. (Barnett, J.)[2] The court found that Jessica was neglected and committed her to the care of the Department. Her grandparents, meanwhile, had become foster parents for the Department and Jessica's placement with them was never changed.
Upon receiving temporary custody, Jessica's grandparents then supervised Nancy's visits with her daughter. The relationship between Nancy and her in-laws had not been a good one for some time. In 1991, Jessica's grandmother had asked the police to go to Nancy's house because Nancy was acting strangely and she felt Jessica was not being fed. After the award of temporary custody, CT Page 13575 Nancy began to call Fred and Jeanne S. regularly. Fred S. testified that she harassed them and that he had to secure a court order to stop her behavior. He stated that at various times Nancy had threatened to burn his house, punch his wife in the face and do bodily harm to his other son and his three children. Once she blocked his driveway and refused to let him leave. She left after he went to call the police. There were also regular problems with Nancy's refusal to return Jessica to them at the conclusion of visitation and her refusal to let Jessica take toys with her. Fred. S. kept the Probate Court order with him and called for the help of the local police department several times. The relationship has not been helped by each feeling the other contributed to Paul S.'s untimely death.
With court involvement came the first of many evaluations. David M. Mantell, the court appointed psychologist, who saw Nancy in his capacity as an evaluator for the first time on September 21, 1993, found that Nancy showed "multiple signs of a major mental disorder such that she is not judged competent to care for her daughter or visit unsupervised." On October 13, 1993, after seeing Jessica and the grandparents as well as Nancy S., Dr. Mantell reported, based on testing results and his observations, that Nancy's "actuarial profile matches those of persons with a Bipolar Affective Disorder and those who have a schizophrenia of a paranoid type." He testified at trial that during his first interview, his clinical impression was that Nancy was severely mentally disabled and grossly impaired with a manifest thought disorder. He did not have enough information or a sufficiently detailed history to make a definitive diagnosis at that time. In his report of 1993, he stated "Persons with this profile tend to be confused and disoriented, blame others for their problems, show irrational thinking and are prone to intense anger outbursts."[3] His observations of these behavioral characteristics foreshadow Nancy's conduct toward others including her daughter over the next four years.
Nancy's at times confused and disoriented behavior as well as irrational thinking was observed by others throughout the pendency of this case and manifested itself in particular during her supervised visitation sessions with Jessica. Dr. Mantell testified to one example of such behavior in this first interview. He stated that Nancy came to the interview and kissed Jessica, which resulted in a visible lipstick print on the child's cheek. Nancy then told Jessica not to "mess with her lipstick." Jessica denied that she had done so and began to CT Page 13576 decompensate. Nancy labeled this "bratty behavior" on Jessica's part and did not understand the causal connection between her accusations and the decompensation of the child.
Dr. Richard B. Sadler, the court-appointed psychiatrist, performed an evaluation of Nancy and her daughter in October of 1993. At that time, he found:
 "Jessica's persistent theme of "girl spiders", death and a lack of clarity of who was alive and who was not was bizarre and somewhat ominous. The theme of dehumanization as well as the threatening aspects of spiders, in view of Jessica's thought concerning death and her mother's thoughts concerning death . . . . is of note and of clinical concern."
In his evaluation of Nancy, he stated that:
 "Ms. S. demonstrates a severe psychiatric impairment of a paranoid nature which leads her to become overly focused on minute details or to avoid and ignore major impairments in her functioning which have been demonstrated over a significant period of time . . . . She does, however, have a nearly delusional if not frankly psychotic preoccupation with her in-laws, feeling them to be persecuting her in order to take her child from her and to appropriate her Social Security benefits . . . . . . . . . . . . . The paranoid concerns of Ms. S. have clearly impaired her parenting abilities and her judgment is currently impaired to such a degree that Jessica would be considered by me to be in at least emotionally and possibly at physical risk if she were in her mother's unsupervised care."[4]
At a court hearing in November of 1993, Nancy was acting so strangely that Dr. Sadler examined her briefly. He prepared a handwritten statement of his findings and found her to be "out of touch with reality and in a physically agitated state. In my opinion, Ms. S. is gravely disabled and requires hospital treatment." Subsequently, Nancy S. was hospitalized psychiatrically and began a course of psychotropic medication which continues to this day. CT Page 13577
The events in June of 1993 which led to state involvement were not the first time that the Department had become involved with Nancy and her family. Judge Barnett's decision details six referrals to the Department concerning Nancy and Jessica between 1993 and the date of the neglect trial. The sixth and last highlights Nancy's preoccupation with death, a persistent theme which Jessica had also internalized. In the summer of 1993, Nancy called a local funeral home to inquire about a casket for Jessica, and the funeral home contacted the authorities.
In accordance with Judge Barnett's orders, visitation was three hours a week in addition to one three hour block of time once a month. Visitation continued without change in the authorized schedule until April of 1995. Nicole Ehrhardt, the Department caseworker during 1994 and 1995, testified that Nancy had difficulty in organizing activities for the long visits and in making adequate plans for them. Issues of death continued to surface. During one of the visits in April of 1995, Nancy and Jessica were decorating helium balloons. One of the balloons burst and Jessica became hysterical. She said the balloon had "died" and had "feelings" and would now be lonely. Some weeks prior to this incident, Jessica took a balloon that she and her mother had named "Christine" home to her grandparents' house. The air went out of the balloon and Jessica reported to her grandmother "my mother is going to kill me for not taking care of Christine and letting her die." On another occasion when Jessica had a cold, Nancy stated "you need to take good care of yourself because a cold can kill you." Ms. Ehrhardt testified that Ms. Shaw would discuss with Jessica being in heaven together with her father. She spoke to Jessica about sending her "Dad home for a good talking-to and they send him back in a box". Jessica repeated the statement that "she was sent home in a box." During a visit to an Indian Museum on March 31, 1995, Nancy talked about the fur Indians obtained by killing animals. Jessica asked further about this and Nancy stated "Nobody kills babies, they're precious in God's eyes and only God knows who lives and dies." Ms. Ehrhardt testified that there was a theme of and a preoccupation with death that surfaced regularly and went beyond the normal concerns of a child of Jessica's age.
Money was another concern and constant irritant, as Nancy would openly talk about her lack of funds in front of Jessica, upsetting the child. Often the caseworker would pay for food while on outings, even though she had made it clear to Ms. S. CT Page 13578 that this would be her responsibility if she made such plans. She testified to one trip to Burger King, when Jessica did not finish her food, her mother berated her for not eating it, telling her how expensive it was. On a trip to a mall in November of 1994, Nancy pointed out a very expensive toy to Jessica, even though Jessica had expressed no interest in it. She explained to Jessica she had no money to buy this expensive toy and she would have to look for something cheaper. Jessica picked out an Indian headband and Nancy left the store without paying for the item. When the clerk followed her and demanded payment, at first she stated she had paid and then paid for the item. On a visit in early 1995, Jessica had ten dollars from her grandparents. Ms. S. reacted to this fact stating "It's Fred's money, so we might as well spend all of it."
As a result of Nancy's often angry, inappropriate behavior during supervised visitation, Jessica was chronically worried about her mother, the caseworker stated. She was worried that her mother had no money, no food, no tires for the car and shouldered concerns that should not have been placed upon her. During visitation, when Ms. Ehrhardt intervened to stop some of these negative interactions, Nancy said it was her constitutional right to tell the child whatever she wanted. She would and could not moderate her behavior for her daughter. Despite telling Nancy that these matters should be discussed after the end of the visit, Nancy continued to be argumentative. Often she directly involved Jessica. It was rare that a visit was uneventful. Many were upsetting for Jessica and her mother would drive Jessica to tears and the child could not say goodbye. Visits were marked by repeated difficult moments between the social worker and Ms. S., as Ms. S. was unable to "understand that her behavior and conversations impacted her daughter in a toxic way."
During 1993 and 1994, Nancy received individual counseling and parenting education services to aid her in making the personal changes necessary to be able to parent Jessica and to reunify with her. Nancy was prescribed medication for her illness and some of her more florid symptoms lessened. Nancy and Jessica were in therapy together with Jeremy Driscoll, a psychiatric social worker at Hungerford Hospital Child Guidance Clinic, another service offered to assist Nancy's reunification with Jessica. Initially these had been group sessions, which were then changed to individual sessions in which only Nancy and Jessica participated. Despite such accommodation to her wishes, Nancy complained about these sessions. Mr. Driscoll reported increasing CT Page 13579 problems and that Jessica was out of touch with reality. He feared Jessica was on the verge of a nervous breakdown. He noted that Nancy's ability to benefit from therapy was compromised by her anger and impaired mental health. He saw her infantilize the child and found that her ongoing psychotic processes caused Jessica to withdraw. Nancy also had an unsatisfactory ability to tolerate Jessica's developmental lags. Often Jessica would respond negatively to her mother, hide under a table or a chair and become agitated and cry. Nancy's outbursts against the grandparents were also very troubling to Jessica.
In October 1994, Jessica was psychiatrically evaluated by Dr. Peter Smith, a psychiatrist at the Child Guidance Clinic, who also interviewed Nancy S. He found Nancy had "loose associations, rambling speech and was quite illogical. She was clearly positively inclined towards her daughter, very loving, but also had very little grasp of developmental needs of children." His recommendation at that time was to continue to closely supervise visitation. He stated "working toward reunification is a reasonable proposition, but mother's mental illness makes this at times problematic."
By the early spring of 1995, Jessica's behaviors at home and in school began to show increased loose thought and decompensation. The Department's observations of the supervised visits, behavior in school and the reports from her grandparents all evidenced accelerating problems. Given Jessica's deteriorating mental state, the Department filed a motion to suspend visitation which was granted in late April of 1995. At that time, all of the professionals dealing with the family felt it important to secure more medical and psychiatric information about Jessica who was then hospitalized at the Newington Children's Hospital for a period of two months. By the date of the court order suspending visitation, Ms. S.'s ability to interact with Jessica had shown no improvement. When her medical record, Department reports, notes from the grandparents and Dr. Mantell's psychological evaluation of 1995, were reviewed by Dr. Sadler on April 11, 1995, he reported that:
 "I find no indication that Ms. S. has in any way increased her ability to interact with her daughter. Ms. S. has not shown therapeutic progress regarding her interactions with her daughter, nor in her own functioning. Ms. S. is not capable, in my opinion, of adequately supervising her CT Page 13580 daughter's care. Ms. S. has effectively interfered with appropriate foster care of her daughter over a number of years . . . . Ms. S. has failed to show rehabilitative potential and she had not shown an ability to inhibit her own impulses or emotional needs in order to provide Jessica with appropriate parenting . . . . In my opinion, Ms. S. is not capable at this time and is unlikely to be capable in the future of independently parenting or providing an environment in which Jessica would be able to be parented in an appropriate and developmentally adequate manner." (Emphasis added by the court).
After the neglect adjudication, specific expectations were set for Nancy S. which needed to be met before Jessica could be returned to her. Among those were the necessity to keep all, appointments with the Department. Ms. Ehrhardt testified that after January of 1995, Nancy's compliance deteriorated. Also, although Ms. S. regularly visited with Jessica, the visits were replete with inappropriate behavior and conduct that made such visits actively detrimental to Jessica. Ms. S. also was not able to plan properly for the once-monthly three hour block of visitation awarded her by the court. Destinations were often changed at the last minute, approval for them was not sought in a timely fashion and Ms. S. rarely had sufficient funds to carry out the activities she sought out. The Social Study prepared by Ms. Ehrhardt[5] lists some ten separate incidents of her lack of planning, failure to have sufficient funds and inappropriate interactions with Jessica.
As part of the expectations and treatment plans, Ms. S. was also to cooperate with the Department and all care providers, which she failed to do. Despite being told to stop, she continued to speak negatively about Jessica's grandparents, discussed her financial situation with Jessica and spoke to her about adult issues, including Jessica's eventual return to her mother. She was disruptive at Jessica's school on one occasion and on another in November of 1994, read a progress report to Jessica which the child was not able to follow and which was inappropriate for her. She was unable to follow directions given to her by Jeremy Driscoll, the psychiatric social worker providing joint therapy for her and for Jessica. She did not maintain adequate housing and income, refusing to seek social security disability income until recently, claiming that the grandparents only wanted CT Page 13581 Jessica so that they could secure that income on the child's behalf. Her house was lost to foreclosure proceedings and until her receipt of social security income, she was destitute and relied on charity and gifts from her boyfriend to survive.
Shortly after visitation with her mother ended by court order, Jessica was hospitalized at Newington Children's Hospital on May 2, 1995. Two months later, on July 5, 1995, she was discharged. She was evaluated medically, psychologically and psychiatrically. She began a course of psychotropic medication. Upon discharge, she was tentatively diagnosed as having Oppositional Defiant Disorder, Bi-Polar Affective Disorder and with Parent-Child Relational Problems[6]. Due to her young age, a definitive diagnosis was not possible. The experts found that the prognosis for Jessica was very guarded.
 "While she achieved a significant level of improvement in her interactions with other children, her socialization remains an issue of great concern. Jessica responded very positively to the structure and consistency of the milieu, which was carried out in her grandparents' home . . . . While Jessica has responded to Mellaril and was able to be somewhat more organized with this medication, she does still have difficulty in focusing and with her thought organization."
 Nonetheless, Jessica had some significant strengths. She was found to be:
 "an attractive, delightful child who has intellectual ability. This, combined with the great efforts that have been made by her grandparents to keep her interested in learning, makes her a very interesting child to be around. She has the potential for doing well in school if given the right structure and supports."
The long term concerns were that Jessica:
 "will require the support of therapists throughout her childhood and, perhaps, throughout her life. She will need to be followed carefully by a psychiatrist throughout her childhood and it is very likely that she will need to be maintained on CT Page 13582 medication. It is of the utmost importance that she be in the care of people who can assure that she will receive the medication and the mental health care that she needs." (Emphasis added).
Upon her discharge in July, Jessica returned to the care of her grandparents who had actively participated with the program at Newington Children's Hospital. They had struggled and continue to struggle to understand their granddaughter's highly specialized needs and had done all they could to provide for those needs on a daily basis. They attended special sessions at the Hospital to assist them in comprehending her diagnosis and care needs.
B. POST-PETITION FACTS: (after September 22, 1995).
Initially it was hoped that Jessica could be returned to her school and main-streamed with the other children as before. Jessica had previously been diagnosed a special education child in a pre-K screening program in 1992. After her hospitalization, placing her in a regular classroom proved not possible and Jessica was enrolled by her school district in the Wheeler Clinic School, where she receives specialized attention and support, at times requiring one-on-one work not available in the ordinary classroom setting. Her treatment at the Hungerford Child Guidance Clinic was ended and she began treatment at the Wheeler Clinic. At the Clinic, Pamela Neary, a social worker, provided supervised therapeutic visitation sessions for Jessica with her mother starting on December 11, 1995. Catherine DePorte, another social worker employed by the Clinic, provided individual counseling to Jessica and was her primary therapist from June of 1995 to August of 1996. She worked closely with Jessica and her grandparents. Ms. DePorte did not work directly with Nancy S., as Jessica's daily care was being provided by her grandparents and not her mother. She testified that she focused on helping Jessica's grandparents learn how to parent her and keep her safe. She taught them skills about how to cope with events that took place with their granddaughter and gave them suggestions for interventions. She found both Fred and Jean S. to be cooperative and to show a keen interest in learning how to care safely for Jessica. In her individual therapy sessions with Jessica, she stated that the child was trying to find out where she belonged and to make sense of her world, as she was only too well aware of the competing claims on her loyalty. CT Page 13583
Ms. DePorte had only limited contact with Nancy and Jessica together. She saw Jessica in the waiting room briefly and observed two supervised visits. Nonetheless, she regularly consulted with Pamela Neary and was well acquainted with the difficulties which arose in those sessions. She also had ongoing discussions with Jessica's teacher. These three individuals including the psychiatrist monitoring Jessica's medication made up her treatment team at the Clinic. Ms. DePorte testified that because of the losses Jessica has already experienced, including the death of her father, all contact with her mother should not be lost. Nonetheless, because of Nancy's mental illness and its impact on Jessica, she recommended visitation be more limited than one hour a week, suggesting a reduction to one hour every other week and that it continue to be therapeutically supervised.
Jessica's present therapist, Jessica Assard-Wu, also testified. She stated that Jessica had adjusted to the academic setting in which she was placed and is developing her social skills with peers. She had some difficulty transferring her attachment from Ms. DePorte to her, but their own relationship has improved. She sees Jessica as having adjusted well under the extremely difficult circumstances of her life and her own as well as her mother's mental illness. Ms. Assard-Wu has worked therapeutically with the grandparents, who actively participated with her. She finds them very loving toward their granddaughter. They understand and work with her difficulties, but also benefit from ongoing reminders as to what actions best to take with this mentally fragile child.
Ms. S., since the end of the sessions with Jeremy Driscoll, has not been involved in therapy directly with Jessica. She has received regular weekly therapeutically supervised visits with her daughter at the Wheeler Clinic. Those visits have now continued for almost two years. Ms. Neary testified that she understands her role as providing a safe and secure environment for Jessica to meet with her mother. She also stated she provided Nancy with information about how to deal with Jessica and discusses parenting issues with her from time to time. She, like other observers, testified that Jessica and Nancy enjoy each other's company, but theirs is not the normal parent-child relationship. They interact more as peers. She stated that a one hour supervised visit was the maximum that Nancy could safely parent the child. She also found that Jessica was satisfied by the length of the visits. Ms. Neary also echoed Ms. DePorte's suggestion of a reduction in the frequency of the contact between CT Page 13584 mother and daughter to one hour every other week.
As to the visits themselves, Ms. Neary finds that she continues to need to intervene on occasion. Many of the same behaviors by Nancy directed toward Jessica noted by the case worker in 1994 and 1995 are still present. Nancy, from time to time, talks about the legal issues surrounding Jessica's placement. On one occasion, Nancy slumped down on the chair and did not respond to Jessica. Both Jessica and she, observing this behavior, were truly concerned about Ms. S., only to have her sit up and say she was joking. Even after her mother responded, Jessica was very upset by her mother's behavior in this session. There continues to be a lack of boundary setting and appropriate adult-child interaction, although Ms. Neary found some improvement in Nancy's ability to interact with Jessica.
At trial, certain professionals who have been involved with Nancy S. and her course of treatment testified. Dr. Goldberg, a psychiatrist, provided medication backup at the Bristol Hospital while Nancy was at the clinic. He was unable to evaluate her parenting skills and had never seen her with Jessica. Dr. Wehrboff, a clinical psychologist, saw Nancy in 1995 for four sessions and in 1996 for six sessions. He observed one parent-child supervised visitation where, he stated, the parent-child interaction was appropriate. He believed Jessica to be a normal average child and thought that Nancy could parent her. Dorothy Berlinski, a social worker, who leads the group sessions in which Nancy continues to participate, also testified. She stated she did not evaluate the parent-child interaction and never saw Jessica with her mother. She could not provide an opinion about Nancy's parenting skills as she did not have enough information. Each of these witnesses provided important information about Nancy's progress in treatment and testified that she is, while on her medication, symptom free. With the exception of Dr. Wehrboff, none of these professionals had evaluated or seen Nancy S. in a professional context with her daughter; none had treated Jessica, and none could evaluate Nancy's ability to parent her child. Dr. Wehrboff appeared not to understand fully Jessica's specialized needs and the court cannot credit his opinion.
Since the filing of the petition for termination of parental rights, Nancy and her daughter have also again been evaluated psychiatrically and psychologically by both Dr. Sadler and Dr. Mantell, respectively. Dr. Sadler interviewed Nancy S. in July of CT Page 13585 1996 for two hours and reviewed extensive documentation concerning his own earlier evaluations and affidavits, Dr. Mantell's reports and records from the various treatment providers. At the time of the interview, Dr. Sadler testified that his clinical impression of Nancy remained the same, as recorded in his written evaluation.[7] He found her presentation to be subtly psychotic and did not attempt a diagnosis at that time. She had, he stated, an increasing awareness that there was something wrong with her and was beginning to be able to talk about her symptoms. He found that she had pursued reasonable attempts to understand Jessica and had worked hard, but the gains were small. He found "she had a psychotic condition in her own right and struggles with her relationship to reality and ability to distinguish fact from fantasy. She was not capable of responding to Jessica's highly specialized needs and despite medication and her higher intellectual function, her remaining mental difficulties interfered with her ability to minimally care for Jessica." He did not believe she could ever be rehabilitated to a point where she could safely parent Jessica.
Jessica's mental illness, he found, causes this child to struggle with how the world works and the nature of her relationships to others. She questions who she is in a very basic sense and does not always think of herself as human — sometimes she sees herself as an object. Her mother's confusions and own problems directly impact Jessica's struggle with the same specific issues. Her mother's condition aggravates Jessica's condition as Nancy encourages Jessica's misunderstandings and confusion. Nonetheless, he stated, despite the negative interaction of their illnesses, Jessica would be ill regardless of the status of her parent. Her illness is independent of her mother's condition and not merely reflective of it. He stated that Jessica had a better chance of developing if she were with a single reasonable adult making the important decisions in her life. He believed that it was important for Jessica to have limited contact with her mother, but that her caretakers should make the decision on that contact. He based that statement on the ongoing relationship Nancy and Jessica had which has both significant positive and significantly negative aspects. His recommendation was for termination of parental rights to provide Jessica with stability and end as much as possible her struggle with clarity, stability and safety.
Dr. Mantell prepared a psychological report dated June 5, CT Page 13586 1997.[8] During his testimony at trial, he outlined his contacts with the family members in 1996 and 1997. He found that Nancy S. "had shown significant recovery from her previous disabled condition, but she had significant impairments from her ongoing mental illness despite intensive medication and talk treatments. She possessed minimal insight into her own disorder", he stated, "and had even less insight into her daughter's disorder and the impact of her own illness on the child's welfare." He found the relationship between the two to be painful and disorganizing and to cause a severe derailment in the child's thinking as a consequence of contact with the mother. He saw no significant rehabilitation on the part of the mother so that she could assume a responsible position in her daughter's life in the foreseeable future. He, too; recommended a termination of her parental rights to Jessica as in the child s best interest. Dr. Mantell had met with Jessica's grandparents. He testified that the grandparents were "satisfactorily adjusted with normal range characteristics and had a strong positive relationship with each other." He found them to be suitable care providers for Jessica.
Despite his unequivocal recommendation. Dr. Mantell also stated there should be future contact between Jessica and her mother. He found that they were engaged with each other, even though he did not see an ordinary parent-child relationship between them. He stated "it is a terrible and awful thing to face the loss of a child, particularly for a person who has sustained many other losses in her life".
At present, Jessica continues to reside with her grandparents. Her grandfather testified as to the many steps they have taken to provide properly for her. He stated that in the beginning there were many difficulties. He admitted until he and his wife were instructed otherwise they had resorted to corporal punishment. He stated that they had benefited from the program at Newington Children's Hospital and the work with Jessica's therapists. They have learned a great deal about parenting their special needs granddaughter. He spoke of playing games with her and of chasing her through the house at times while she hid. He spoke of Jessica's love of going to the beach and the things that they did during the summer months. He and his wife have learned to use concrete and direct rewards to train her to do certain things, such as making her bed. These techniques have worked well and they have seen improvements in Jessica's behavior at home. The hostility between them and Jessica's mother remains. Nonetheless, both he and his wife are committed to doing CT Page 13587 everything that is necessary for Jessica, including providing contact if Jessica's therapists believe it to be in her best interests.
C. ADJUDICATION
With respect to the statutory grounds for termination of parental rights, the court finds, by clear and convincing evidence, that Jessica was previously adjudicated neglected. Further the court finds from the compelling testimony of the many witnesses, including the court-appointed evaluators, that by September 22, 1995, Nancy S. had failed to achieve such a degree of personal rehabilitation as would encourage the belief that, within a reasonable time considering the age and needs of her daughter, she could assume a responsible position in her life. Connecticut General Statutes § 17a-112(c)(3)(B).
"`Personal rehabilitation' as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Migdalia M. 6 Conn. App. 194,203, 504 A.2d 532 (1986). See also: In re Juvenile Appeal,1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802,474 A.2d 1259 (1984). While Nancy has taken many steps to rehabilitate herself and made some progress, her mental condition remains such that she cannot now or in the foreseeable future safely parent Jessica, who has significant specialized needs of her own. Further, the court finds that this ground had existed for more than one year before the filing of the termination petition.
D. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112(e) concerning Nancy S.:
1) Timeliness, nature and extent of services offered and made available to the parent and the child in order to facilitate the reunion of the child with the parent. Extensive and timely services were offered to Nancy, but due to her illness and its impact on her daughter and her daughter's illness, reunification was not possible.
2) The court finds that the Department made reasonable efforts to reunify the family, given the situation and CT Page 13588 circumstances, as far as possible. Nancy received medical and counseling services, parenting assistance, parent-child therapy and supervised therapeutic visitation with her daughter. The Department made ongoing and reasonable efforts to reunify her with Jessica.
3) The terms of an applicable court order entered into and agreed upon by any individual agency and the parent and the extent to which all parties have fulfilled their obligations under such order. Several sets of reasonable court expectations were set for Nancy S., only some of which she was able to meet. The important goals of cooperation with her treatment providers and learning how to interact with Jessica have still not been mastered and are unlikely to be mastered by Nancy in the future.
4) Jessica has strong emotional ties with her grandparents, who have provided the physical, emotional and educational support she needs and requires. She looks to them for her parenting needs, stability and security.
5) Finding regarding the age of the child. Jessica is eight years old.
6) Finding regarding the efforts of the mother to adjust her circumstances, conduct or conditions to make it in the best interests of Jessica to return her to her home in the foreseeable future and (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. Nancy has made significant efforts to adjust her circumstances and conduct to be able to safely parent her child, but her ongoing illness prevents it from becoming possible.
7) Finding regarding the prevention of the parent from having a meaningful relationship etc. The Department has taken many steps to encourage and foster Nancy's relationship with Jessica, including the provision of transportation and supervised visitation on an ongoing basis. No unreasonable conduct is noted.
E. DISPOSITION
Jessica has been cared for by her grandparents since she was CT Page 13589 four years old. She cannot recall another home, although she continues to have a loving relationship with her mother. Unfortunately and through no fault of her own, her mother, Nancy S., cannot provide her with safe and reliable parenting and a stable home. Her grandparents have been able to do so, undertaking the difficult task of learning how to parent their special needs granddaughter and attempting to understand the nature of her mental illness. Jessica's place in the world has been unresolved for a long time and she should not need to wait for permanency any longer. Based upon the clear and convincing evidence and the foregoing findings, the court determines that it is in her best interests that a termination of parental rights enter with respect to her mother, Nancy S. These findings are made after considering Jessica's sense of time, her need for a secure and permanent environment and her close relationship with her foster parents, her grandparents. The court therefore hereby ORDERS that the parental rights of Nancy S. to Jessica are terminated. It further ORDERS that the Department is appointed the statutory parent of Jessica for the purpose of securing an adoptive family and that the grandparents be given paramount consideration. The Commissioner shall file with this court no later than ninety days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
Barbara M. Quinn, Judge Child Protection Session