MEMORANDUM OF DECISION
On June 9, 1997, the Department of Children and Families, hereafter "DCF", filed petitions for the termination of the parental rights of Kizzie C.E. to her two children, Wanda C. and Yasmine E. Petitions were also filed against Miguel O., the acknowledged father of Wanda and against Emad E., the acknowledged father of Yasmine and Kizzie's husband. Wanda is now four years old and Yasmine is two years and eight months old. Wanda was five months old when she was removed from her mother's care on March 24, 1995, after her older sister, Jannell, was returned by Kizzie to Jannell's foster parents with significant bruises and an injury to her liver following an an unsupervised weekend visit. There has been a history of unexplained physical injury to Kizzie's children while in her care. The pattern of events repeated itself in early November, 1996, after an unsupervised weekend visit between Wanda and her mother. Wanda returned from the visit with several large dark purple bruises and a burn on her ankle consistent with a cigarette burn. Yasmine, then eight months old, was also removed, although she had not been physically injured. Both Wanda and Yasmine were adjudicated neglected on December 27, 1996 and committed to the CT Page 11481 care and custody of the Commissioner of the Department of Children and Families.
The court finds that all of the parents were personally served with the petitions and have appeared through court-appointed counsel. The court further finds that there is no action pending in any other court affecting the custody of either child. On the first day of trial, September 14, 1998, Kizzie consented to the termination of her parental rights to her two children. The court accepted her consent as knowingly and voluntarily made with the advice of competent counsel and with a full understanding of the consequences of her act. Counsel for Miguel O. attended the trial and reported that he had not had any contact with Miguel for two months, but that his client wanted to contest the petition. On the second day of trial, Miguel O. appeared personally and consented to the termination of his parental rights to Wanda C. The court found that his consent was knowingly and voluntarily made, with the advice of competent counsel and with a full understanding of the consequences of his act. The court accepted his consent. The petitions were amended to allege the consent of Kizzie C.-E. and Miguel O. Emad E. attended the trial with his counsel and contested the allegations of the petition.
During the trial, the court heard the testimony of five DCF social workers and two court-appointed psychological evaluators, Dr. Bruce Freedman and Dr. Robert Meier. Constance M., a parent educator, testified concerning Emad E.'s parenting abilities and Emad E. himself testified as well. The court also received forty-one exhibits. Trial concluded on September 16, 1998.
After the consents of both of the parents of Wanda C. and the mother of Yasmine E., the only adjudicatory issue remaining concerns Yasmine's father, Emad E. DCF alleged first that the child was previously adjudicated neglected and that Emad E. has failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the child, he could assume a responsible position in the life of the child. The second claim is that he has committed acts of omission and commission in violation of Connecticut General Statutes § 17a-112(c)(3)(C) in that the child has been denied the care, guidance or control necessary for her physical, educational, moral or emotional well being. Connecticut General Statutes § 17a-112(c)(3)(B)and(C). At trial, DCF did not proceed on the last ground, but strenuously CT Page 11482 argued that Emad had failed to rehabilitate himself, under all the circumstances of this case.
 1. FACTS
The court finds the following from the evidence presented at trial:
Emad E. came to the United States in February of 1994 after growing up and being educated in Egypt. He is thirty years old and Yasmine is his only child. He is a college graduate and is employed as an accountant. Since his arrival, he has received his green card and is a permanent resident alien. Emad E. testified that he met Kizzie in March of 1995. They were married on October 5, 1995, shortly after Kizzie informed him that she was pregnant with his child. He reported that Kizzie did not tell him the real reason her two older children were removed from her care until after the marriage. On February 2, 1996, their child, Yasmine, was born. Emad and Kizzie have remained together since their marriage, with some brief periods of separation, and resided together on the last day of trial. Nonetheless, Emad E. testified that he is considering a legal separation or a divorce as he stated that Kizzie had been unfaithful to him.
During the spring and summer of 1996, while Kizzie had supervised visits with her daughter, Wanda, Emad E. also visited and developed a relationship with this child. DCF found him to be a stabilizing influence in Kizzie's life. Constance M., a parent educator, worked with the family from January of 1997 to the present time. She found Emad E. to be a loving father who knew how to relate to his child. He was nurturing and demonstrated an interest in the children. "He definitely," she stated, "enjoys being with his daughter, laughing at what she was doing, reading to her and playing with her."
While Emad E. demonstrated the interest and skills to be a committed and loving parent, DCF claims that he has been unable to rehabilitate as a parent because he has not been able to take the steps necessary to provide a safe home for Yasmine. Specifically, since Yasmine's removal from the home in 1996, when she was eight months old, and on a regular basis since that time, DCF has requested that Emad E. establish a separate residence from Kizzie and not permit her to have any contact with Yasmine. Emad E. countered these claims at trial, stating that DCF required him to sever all contact with Kizzie, including CT Page 11483 financial contact. In addition, he testified that he did not trust DCF about their plan unless they were willing to put it into writing and secure a court order that his daughter would be returned to him if he took this drastic step. And so a stalemate ensued. As one of the DCF social workers, Katherine Hustek, put it, "When it became clear he was not going to create a safe environment for Yasmine, we had nowhere to go (concerning reunification) until he created the environment in which it could happen." As a result of this impasse, for one year and eleven months since November, 1996, Yasmine has been in foster care with only supervised visits with both her mother and father. There has been no opportunity to provide unsupervised visitation with her father to see if reunification would be possible.
In addition to his unwillingness to establish a residence separate from his wife, Emad E. has also consistently stated to the various DCF social workers involved that he never saw Kizzie injure any of the children. According to Emad, during the eight months that Yasmine was in Kizzie's primary care, Kizzie never injured Yasmine. Despite his assertions, Emad's ability to observe the day-to-day care provided was limited by the many hours he worked, often until late at night. Nonetheless, it is the case that there is no evidence that Kizzie ever physically injured her youngest child. As to Jannell, Emad testified that this was in the past when Kizzie was very young. Further, as to Wanda, he did not personally witness anything. He reiterated this position at trial, despite the evidence that had been presented, stating that he believed the physician's reports of Wanda's injuries in November, 1996, to be exaggerated. Emad E. also acknowledged that he had told Dr. Meier that, if he ever found that Kizzie had done these things, he would leave his wife. When asked about this statement at trial, he stated that he still felt this way, but that he remained unconvinced that Kizzie had injured her children.
The evidence at trial, which Emad E. heard, was overwhelming that Kizzie injured her two oldest children on several occasions. While the court, as well as Emad himself, can look to Kizzie's young age and background when she began to care for her oldest child, from the point of view of an unprotected infant, such reasons do not remove or lessen the impact of parent-inflicted trauma. Kizzie's life and the events which befell her children reflect the impact of multi-generational abuse, for Kizzie herself spent most of her childhood and teenage years in foster care. She was herself abused, neglected and traumatized by her CT Page 11484 family of origin and in other settings as a young teenager. She has never had the experience of a caring, nurturing family. She was fourteen when her oldest child, Jannell, was born, while she herself was still committed to the care and custody of the Department of Children and Families.
Initially, Jannell left the hospital after her birth to be in the primary care of Kizzie. There were several health concerns about Jannell, who was a failure-to-thrive baby. Kizzie brought Jannell to the hospital when the child was four weeks for a sleep apnea episode and unexplained bleeding. During that hospital stay, Kizzie broke her infant's right femur while alone with her in the hospital room, claiming to exercise Jannell's leg. The force necessary to break an infant's still pliable leg flatly contradicts such an explanation. As a result of this incident, on August 12, 1992, Jannell was removed from Kizzie's care and placed in a foster home. such an explanation. As a result of this incident, on August 12, 1992, Jannell was removed from Kizzie's care and placed in a foster home.
In 1993, Kizzie began the process of attempting to reunify with Jannell. She appeared to the professionals involved to have taken many of the steps necessary to have Jannell returned to her. She took parenting classes, she visited regularly and she was viewed in counseling as understanding the issues in her past which contributed to her inability to care for Jannell. By the time Wanda was an infant in 1995, Kizzie had progressed to unsupervised overnight visits with Jannell.
Unfortunately for Jannell, the goal of reunification with her mother could not continue. In March, 1995, about the time Emad E. and Kizzie first met, when Kizzie returned Jannell to her foster mother after an extended visit, Jannell could not walk upright. Jannell was immediately taken to the hospital, where the records reflect that the child was "doubled over" and had multiple cuts and bruises. She had two human bite marks on her right wrist and left thigh as well as scrapes on her forehead. Testing revealed a "laceration to her liver that could only have been caused by abdominal trauma. It was determined that the bite marks were only two or three days old."[2] Kizzie's explanation was that she did not hit her child and she did not know how Jannell's injuries occurred. As a result of the injuries inflected on Jannell, Wanda was removed from Kizzie's care as well and placed in foster care and the present legal process as to Wanda began. CT Page 11485
Subsequently, as a result of these injuries to Jannell, Kizzie was criminally charged with assault in the second and third degree and with risk of injury to a child. On April 21, 1997, she pled guilty to the charges of assault in the second degree and risk of injury to a child.[3] She received a suspended sentence and was placed on probation for five years. Emad E. was and is aware that she pled guilty, but minimizes this and the actions Kizzie took which resulted in the charges and her subsequent felony convictions.
Unfortunately, despite the glowing opinion of the various service providers, Kizzie's conduct with Wanda has followed the same pattern as her conduct with Jannell, and Wanda also received non-accidental injuries while in her mother's care. There were some incidents reported even prior to the removal of Wanda from her mother.[4] But the long holiday weekend of November 8, 9, and 10, 1996 proved fateful for Kizzie, Emad E. and Yasmine as well as Wanda. Ms. Hustek testified that by the summer, 1996, DCF's plan was to reunify Wanda with her mother, with all deliberate speed. In November, the second series of overnight unsupervised weekend visitation was begun. Kizzie claims, and Emad supports her claims, that Wanda arrived from the DCF foster home with small unremarkable bruises on her face and thighs. Neither Kizzie nor Emad has any plausible explanation why they did not report these injuries immediately, except to state they each knew that it would make Kizzie's situation worse. Emad E. testified that he came home from work on Friday at around 5 p.m. at Kizzie's request and determined that the bruises did not need medical attention. Wanda, at that time, had been in her mother's care for about two hours. Having made his determination, he returned to work and did not return until the early hours of the next morning. According to his testimony, Saturday and Sunday passed uneventfully. On Monday, Emad went to work. Kizzie remained in the home with the children. Kizzie did not return Wanda to DCF at the appointed time in the morning. Her explanation was that she has gone to a hospital clinic for previously scheduled appointments for Yasmine and herself. While there, she had Wanda checked by a student doctor and claimed, during the subsequent investigation, that this physician found nothing wrong with Wanda. Her assertion of this report could not be verified. Finally at 7 p.m. that evening, Wanda was brought to the DFC office, all bundled up including her head. When the foster mother undressed the child, she called the Careline about the bruises she found on Wanda and was told to take the child to the hospital the next morning. CT Page 11486
The hospital records of Wanda's admission and earlier records of Jannell were reviewed by Dr. Betty Spivack, then of the Connecticut Children's Medical Center Division of Pediatrics. She performed a child abuse risk analysis and stated that on November 13, 1996, the records reflect that Wanda had a deep purple bruise under the right eye, several scabbed scratches on her face, a one inch scratch on the bridge of her nose, two long linear bruises on the front of her thighs, bruises on the heels of both hands and a two inch long deep purple bruise on her back as well as an apparent cigarette burn on her leg."[5] She concluded that the explanations offered by Kizzie were inconsistent with the injuries.
Dr. Spivack stated in her report that:
"Jannell had received the injury to her femur in a fairly tightly supervised setting. The liver laceration, multiple bruises and bites occurred during brief weekend visitation. The events which occurred in November of 1996 are strikingly similar to the events of March, 1995. Once again, there are multiple injuries of different kinds, in many parts of the body. Once again, this occurred at a time when Kizzie was felt by behavioral professionals to have improved her parenting skills. Mr. "E." did not apparently act in a way which was able to prevent the injuries which Wanda incurred during her visit to the home."
At that time, Dr. Spivack was unable to see how one could safely initiate unsupervised visitation with either Wanda or Yasmine. As a result of Wanda's injuries, DCF removed Yasmine from the home as well.
 2. TERMINATION ADJUDICATION
As required by the statutes and the case law, the court will first review and consider the facts as they relate to the adjudicatory grounds alleged against Emad E. In construing the requirements of the statute regarding rehabilitation, our courts have held: "`Personal rehabilitation' as used in the statute refers to the restoration of a parent to his or her former constructive and useful-role as a parent." In re Migdalia M.6 Conn. App. 194, 203, 504 A.2d 532 (1986). See also: In reJuvenile Appeal, 1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984). CT Page 11487
While there is no claim that Emad E. physically injured his child or does not love Yasmine, the clear and convincing evidence is that he has not done the one thing necessary to ensure the child's safety; sever his relationship with his wife. He steadfastly denies that there are reasons to be concerned. His denial led him to fail to investigate the charges brought against Kizzie, to fail to acquaint himself with the full details of both the injuries which the children sustained and to fail to consider the trained experts' opinions as to how those injuries happened and who caused them. He never examined the consequences of such conclusions for his daughter. Admittedly the separation requested of him was a drastic step, but so too were the injuries the two older girls sustained drastic and potentially life-threatening. And only now that personal difficulties have developed in his marital relationship with Kizzie, does he stand ready to separate from her and to secure separate living quarters.
Unfortunately for Emad E. and Yasmine, his present intention to separate from Kizzie, after almost two years of being asked to do so, falls far short of demonstrating his rehabilitation as a parent. Throughout the time Yasmine has been out of the home, Emad has been unwilling to take the steps necessary to safeguard her well-being. Dr. Robert Meier testified that Emad E.'s present willingness to sever his relationship with Kizzie would be inadequate for Dr. Meier to recommend placement of Yasmine with her father. Dr. Meier stated that "most critical is a person's behavior over time as we know that past behavior is the best predictor of the future." The court concludes from the clear and convincing evidence that Emad E. has failed to achieve such a degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of Yasmine, he could assume a responsible position in her life.
Also required for adjudication is a finding by the court that either the facts warranting the adjudication have existed for more that one year prior to the filing of the petition or that, under the totality of the circumstances, it is in the best interests of the child that the time period be waived. Connecticut General Statutes § 17a-112(d)(1). Waiver of the one year requirement is within the court's sound discretion. InRe Romance M., 30 Conn. App. 839, 622 A.2d 1047, appeal dismissed, 229 Conn. 345, 641 A.2d 378 (1993). In Re Christine F.6 Conn. App. 360, 505 A.2d 734 (1986). The waiver is appropriate in this case where Emad E.'s denial of the seriousness of his wife's conduct has continued for well over a year, despite all the CT Page 11488 evidence of his wife's actual conduct. Waiting for the time required by the general provisions of the statute to pass is not in the best interests of Yasmine, who deserves permanency in her life. She has been in foster care more than twice as long as she was with her parents and no longer views them as her primary caretakers. The court concludes that it is in Yasmine's best interests that the one year time requirement be waived and it is so ordered.
 3. REQUIRED FINDINGS
No findings are made as to Kizzie C.-E. and Miguel O., as each has connected to the termination. The court makes the following factual findings required by Connecticut General Statutes § 17a-112(e) as to Emad E.:
1) Appropriate and timely services were offered by DCF, including counseling at the Village for Families and Children, parenting classes and training, case work services, and visitation.
2) The court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the family, given the situation and circumstances, as far as possible. Kizzie received substantial services to assist her in regaining her older child Wanda for rehabilitation and reunification. Emad E. also received services, but his ability to understand the seriousness of the issues involved did not increase. He did not take the steps necessary to rehabilitate himself.
3) The Department entered into reasonable and realistic court expectations. Emad E. was not able to meet those expectations.
4) Yasmine and Wanda have been in foster care most of their short lives. Their primary parental relationships are to their foster parents. Wanda's foster mother is prepared to adopt Wanda, if the parents' rights to the child are terminated.
5) Finding regarding the ages of the children. Wanda is now four and Yasmine is two years and almost eight months old.
6) Finding regarding efforts of the parent to adjust his circumstances, conduct or conditions to make it in the best interests of this child to return to his home in the foreseeable future and (A) the extent to which the parent has maintained CT Page 11489 contact with the child as part of an effort to reunite the child with the parent, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. Emad E. has visited regularly and maintained contact with his young daughter. But unfortunately, he has done nothing to adjust his circumstances to make it in the best interests of the child to be returned to him.
7) Finding regarding the prevention of the parent from having a meaningful relationship, etc. DCF has taken many steps to encourage Emad E. to rehabilitate himself and to have a meaningful relationship with Yasmine. He was not able to accomplish this task. The court further finds no inappropriate conduct on the part of DCF.
 4. DISPOSITION
Having determined that the grounds for termination against Emad E. have been proven by clear and convincing evidence, the court will now consider whether termination is in the best interests of Wanda C. and Yasmine E. Wanda has been in foster care since March, 1995, when she was but five months old. Yasmine has been in foster care since she was eight and a half months old. Each child, Dr. Robert Meier testified, has been in foster care for longer than is recommended for children of this young age without permanency. His opinion was that permanency was a critical need for them and that termination of their parental rights to allow for permanency with other caretakers was in both children's best interest. The court acknowledges the "deleterious effect of prolonged temporary care of abused and neglected children." In re Juvenile Appeal (84-CD), 189 Conn. 276,455 A.2d 1313 (1983). The Appellate Court has also noted, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In re Alexander V.,25 Conn. App. 741, 748, 596 A.2d 930 (1992); see generally,JOSEPH GOLDSTEIN, ET AL., BEYOND THE BEST INTERESTS OF THE CHILD99 (1979.)
Wanda's foster mother wishes to adopt the child. Wanda, the current DCF treatment worker testified, interacts well with her foster mother, who is able to anticipate her needs. Yasmine also requires permanency, permanency neither of her parents is able to provide for her. Emad E. has had almost two years in which to demonstrate his willingness to make Yasmine's needs paramount in CT Page 11490 his life. He has not been able to do so. Giving him any more time and leaving Yasmine's future undecided is not in her best interests. The court concludes, based on the clear and convincing evidence, that termination is in their best interests of both Wanda C. and Yasmine E. Accordingly, a termination of the parental rights of Kizzie C.-E. to both her children is ordered. Further, the court orders that Miguel O.'s rights to Wanda C. be terminated and that Emad E.'s rights to Yasmine be terminated. It is further ordered that the Commissioner of the Department of Children and Families be appointed the statutory parent for Wanda and Yasmine for the purpose of securing an adoptive family and a permanent placement for them. If Wanda's present foster family remains willing to adopt her, it is the court's direction that they be given first consideration. In addition, the Commissioner shall file with this court no later than ninety days following the date of judgment a written report of efforts to effect such permanent placements and file further reports as are required by state and federal law.
Barbara M. Quinn, Judge Child Protection Session